## 59351. CARTIN v. BOLES.

McMURRAY, Presiding Judge.

This is a case involving two literary works, *Elijah* and *The Limner,* based upon an alleged breach of contract and plagiarism. We have endeavored to read a record of no less than 611 pages; a trial transcript of no less than 2428 pages, containing several voluminous novel transcripts (drafts and redrafts), plus the parties' briefs of 185 pages and exhibits thereto consisting of 75 additional pages. Our resume of the uncontroverted facts of the case follows:

In or about February, 1973, Hazel Cartin, who had written a rough draft of a novel entitled *Elijah,* which she contends was essentially autobiographical in nature but with names, characters and events altered to render it a work of fiction, contacted Paul Darcy Boles, a well-known local author and experienced writer, having written several novels, for the purpose of assisting her in getting *Elijah* published. Boles accepted the novel manuscript for the purpose of reviewing and analyzing same, which he proceeded to do. Several months later, after extensive communication between the two, Boles highly commended the content of *Elijah* but stated that the work needed to be rewritten by an experienced writer before it could be published. He suggested that he would be willing to do so but that since it would cost him about $10,000 in time from his own writing, that is, "about two months of work," he would work only under contract to protect them both. He proposed a contract paying him $5,000 at the start of the writing and $5,000 on delivery of the finished novel manuscript.

A contract was then entered by and between the parties on June 8, 1973, in which Cartin paid Boles $5,000 "to write and to complete a novel manuscript to be called ELIJAH (or any other title the eventual publisher may desire consequent to the sanction of Hazel Cartin) by September 1, 1973." The contract further stated that "upon acceptance of the novel manuscript by a publisher, and a publishing contract from said publisher she [Cartin] will pay . . . Boles a second $5,000.00." Boles further agreed to turn the novel manuscript over to his literary agent (Fox Chase Agency, Inc., New York) for submission to any reputable publisher for publication in

book form. Boles also agreed, that upon completion of the novel manuscript by him, to submit it to Cartin so that she might be in full agreement that he had been true to the spirit of her material, prior to sending it to his literary agent. Cartin was to be known as the author, that is, the manuscript would be submitted by the agent to a reputable publisher bearing the name of Cartin as the author. The contract then stipulated that all monies from the eventual publication of a book made from the manuscript "that is, all advances, royalties, book club rights, international rights, serial rights, and dramatic rights of any kind, including motion picture, television, and radio broadcast rights, which may accrue to the *author* from publication of this manuscript, shall be divided, equally, between Hazel Cartin and Paul Darcy Boles." The literary agent would render an accounting to both parties and would receive 10 % of the total of all aforesaid monies accruing to the author from book publication, "for his good offices in placing the manuscript with a reputable publisher." The agreement in no way was to be construed as a guarantee of publication. The above is, in substance, the agreement by and between the parties.

Boles did not complete the rewriting of the manuscript by September 1, but it was completed sometime in October, 1973, and he advised Cartin on October 10, 1973, that he was sending it off to his agent to give him a chance to give it a thorough reading while he (Boles) and his wife were on a trip to Italy. Cartin contends that she was not satisfied at that point, that is, she was not in full agreement that he had been true to the spirit of her material prior to sending it to his literary agent; nevertheless, Boles contends that she allowed him to send the manuscript on to the agent while he was on the trip to Italy.

By January, 1974, *Elijah* was being considered by one publisher and Boles was allegedly in the process of revising his latest novel, *The Limner,* which he contended was to be published in the fall. By September 9, 1974, Ms. Cartin became disillusioned with her agreement with Boles and requested return of the $5,000 previously paid, and she consulted an attorney who advised her not to pay the additional $5,000, contending that a breach of contract had occurred.

Thereafter, Ms. Cartin sued Boles in two counts for breach of contract, later amending her suit so as to amount to seven counts, alleging breach of contract, return of literary property, breach of fiduciary relationship, tortious interference with plaintiff's contractual rights and prospective reward, fraud, infringement of plaintiff's common law rights, and unfair competition.

The defendant answered the original complaint by denying the claim or that he had in any way breached the contract and by

amendment thereafter contended that he had exercised his best literary skills and exerted his best efforts to accomplish the writing of a publishable literary work from the manuscript of plaintiff and that he in nowise had breached the contract, but, on the contrary, the plaintiff had breached the contract; and he sought judgment against her for $5,000 for breach of contract, $25,000 punitive and exemplary damages for her failure to act in good faith, and $10,000 attorney fees.

After considerable discovery the case came on for trial, and the parties stipulated that it be heard by the court without the intervention of a jury and because it was a case involving plagiarism, of necessity, the court must review considerable materials relevant to the issues, hence, another superior court judge was designated to sit with the superior court judge to whom the case had been assigned. The court then rendered its findings of fact that the complaint was based upon breach of contract and, as amended, plagiarism.

As to the breach of contract plaintiff was contending defendant's work was not true to the spirit of her own and that the finished manuscript was not approved by her for permission for publication. The court then reviewed certain testimony in this respect and found that the weight of the evidence was on the side of the defendant, that he was not obligated to complete an accurate biographical novel pertaining to the life of the plaintiff nor to please her in every particular nor to incorporate her ideas in the work but to give plaintiff's material "his best and most thorough effort." The court found that while the contract required that the final manuscript be submitted to the plaintiff for her approval as to "the spirit of her material," the evidence was in conflict as to whether she had ever authorized the submission of the manuscript to the agent but that the evidence was such that while she was not totally happy with the submission of the manuscript at the time it was forwarded to a publisher (the agent to submit same to the publisher or publishers), "there was no substantial protest," and the plaintiff had not established by the weight of the evidence any breach of contract on that account.

With regard to plagiarism, the court reviewed all of the testimony of the various witnesses, including experts, and while finding that there were certain parallels between the original and rewritten manuscript of the plaintiff and the novel, *The Limner,* and that the evidence was in sharp and often emotional conflict as to whether the work, *The Limner,* contained plagiarism, and considering the testimony of the defendant that he had completely finished the original manuscript of *The Limner* before he had read plaintiff's manuscript; that even though the plaintiff had shown certain parallels and similarities between *Elijah* and *The Limner,* the

court found that she had failed to carry the burden of proving plagiarism.

The conclusions of law of the two-judge court were that it was unconvinced by the greater weight of the evidence that the defendant either breached the contract or committed plagiarism, finding in favor of the defendant upon the plaintiff's claim.

As to the counterclaim, the court found that the defendant would have been entitled to an additional $5,000 from the plaintiff with 50% interest in royalties had he completed his contract in which he contended the plaintiff had prevented publication; but that any damage claimed by the defendant as flowing from any breach of contract by the plaintiff was "too remote and speculative to warrant recovery," concluding as a matter of law that the defendant was not entitled to judgment against the plaintiff upon the counterclaim. Judgment was rendered accordingly against the plaintiff and for the defendant. A motion for new trial and a motion for reconsideration based upon the general grounds, allowance of illegal evidence and newly discovered evidence were filed and denied. Plaintiff appeals. *Held:*

1. Error is enumerated to the finding of the court that the defendant did not breach the literary contract. With respect to the alleged breach, plaintiff contends the evidence amply demonstrates that a breach of contract occurred. Considering the totality of the allowed evidence, the court, as trier of fact without the intervention of a jury, would have been authorized to have found that defendant failed to remain true to the spirit of plaintiff's story and plaintiff never, in accordance with the contract, approved the rewrite by defendant sent to the agent for submission to a publisher or publishers. Nevertheless, the trial court considered all of this evidence and believed otherwise that plaintiff was given suitable opportunity to object to the sending of the novel manuscript to the agent but chose not to object, acquiescing in sending it to the agent and remaining silent; and in fact the plaintiff never has objected or sought to withdraw it from the agent-publishers until this suit was filed. There was evidence to authorize the findings of the court in this respect. There is no merit in this complaint.

2. As the case law on copyright matters is somewhat limited in this state, we must, of necessity, look to other jurisdictions.

Generally, the right to copyright works of science and the arts is obtained from the Constitution of the United States (Art. I, Sec. VIII, Par. VIII; Code Ann. § 1-125 (8)). Our United States Congress has thus preempted the field as to statutory copyrights. 17 USCA §§ 13, 26 (since revised by Pub. L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2541); Sears, Roebuck & Co. v. Stiffel Co., 376 U. S. 225, 228-229

(84 SC 784, 11 LE2d 661). General ideas (the theme, the plot, etc.) are in the public domain and cannot be copyrighted. Dellar v. Samuel Goldwyn, Inc., 40 FSupp. 534, 536, affd., 150 F2d 612, cert. denied, 327 U. S. 790; Dymow v. Bolton, 11 F2d 690, 691; Borden v. General Motors Corporation, 28 FSupp. 330. In literary works it is not the novelty but the originality of the wording that is protected by copyright. Seltzer v. Sunbrock, 22 FSupp. 621. Similarities, historical facts and incidental details which are necessary to the environment or setting of an action are not material of which copyrightable originality consists. 17 USCA § 1, et seq.; Cain v. Universal Pictures Co., Inc., 47 FSupp. 1013, 1014, 1017; Lewys v. O'Neill, 49 F2d 603, 606, 607, 617-618. Hence, the test of pirating, infringement or literary larceny is as to the originality and whether the production is the result of independent labor or copying others. Jones Bros. Co. v. Underkoffler, 16 FSupp. 729, 731-732; Sief v. Continental Auto Supply, 39 FSupp. 683, 686. Compare Mazer v. Stein, 347 U. S. 201, 218 (74 SC 460, 98 LE 630). Where access to the work (certainly shown here) is admitted, then the inquiry is as to what, if anything, did the defendant appropriate. Seltzer v. Sunbrock, 22 FSupp. 621, supra.

At common law, an author has a property right in his unpublished manuscript and can obtain redress against anyone who deprives him of it by infringement or against anyone who obtains a copy and endeavors to realize a profit by its publication through plagiarism or otherwise; 17 USCA § 2; Wheaton v. Peters, 33 U. S. 591, 656 (8 LE 1055); Caliga v. Inter Ocean Newspaper Company, 157 F 186; s.c. 215 U. S. 182, 188 (30 SC 38, 54 LE 150); Bobbs-Merrill Co. v. Straus, 147 F 15; s.c. 210 U. S. 339 (28 SC 722, 52 LE 1086); Werckmeister v. American Lithographic Co., 134 F 321; RCA Mfg. Co., Inc. v. Whiteman, 114 F2d 86, 89.

In this case the court considered voluminous drafts of manuscripts, that is, at least two of *Elijah*— the original by plaintiff and the rewritten draft prepared by defendant, as well as a copy of a draft of *The Limner* and the original published *The Limner,* and other documents. Here the plaintiff contends that due to the contract by and between the parties, the defendant had access to the unpublished work, thereby a confidential relationship existed between them. This is indeed true, even if they were dealing at arms' length with each other with reference to the work to be performed under the contract. Plaintiff contends and offers evidence (which conflicts with defendant's evidence) that plagiarism and infringement (that is, unfair use; colorable alterations; copying, either unconsciously and unintentional or deliberate and intentional) upon her work occurred in defendant's writing of the

novel, *The Limner.* See Seltzer v. Sunbrock, 22 FSupp. 621, 627, supra. Yet the trial court chose to believe the evidence and testimony of the defendant that this did not occur. Again, while certainly the court was authorized to find for the plaintiff yet the uncontroverted evidence authorized it to find for the defendant, even considering alleged similarities, parallels, and possible appropriations as to the English language. See Eisman v. Samuel Goldwyn, Inc., 23 FSupp. 519, 520; Shipman v. R. K. O. Radio Pictures, Inc., 20 FSupp. 249, 250. This enumeration of error is not meritorious. We do not here reach the other issues complained of, that is, as to whether the court (1) established a legal standard for plagiarism or (2) considered the expert witness standard as opposed to the ordinary observer standard. The trial court did not comment on how it made its determination. We simply find the allowed evidence authorized the findings of the trial court.

3. Without a finding of breach of contract or plagiarism by the trial court such issues as tortious interference with plaintiff's contractual rights, prospective economic rewards, fraud, and unfair competition cannot be considered. The trial court did not err in making any findings as to these other counts of the petition inasmuch as the trial court felt there would have to be a finding of a breach of contract or plagiarism in order to reach such claims. We find no evidence in the record that the defendant ever interfered with plaintiff's contractual rights. The court further found that the defendant did not breach the contract by and between the parties. As the plaintiff and defendant were bound by the contract we do not find any evidence that the defendant interfered with plaintiff's prospective economic rewards as to the proposed book for again the defendant would have had to have breached the contract in order to have interfered with plaintiff's prospective economic rewards. As the parties were inexplicably tied together with reference to this unpublished work, certainly the defendant could not be guilty of alleged unfair competition if he in no way breached their contract.

If the court did not find that the defendant in some way used the plaintiff's literary work in writing *The Limner,* then, of course, the question of fraud and deceit on the part of the defendant is simply too vague for consideration. Further, no evidence was submitted to show a deliberate and intentional scheme on the part of the defendant to defeat the publication of their joint endeavor (in which the defendant would be abundantly rewarded) by scheming, conniving, and conspiring with others to have *The Limner* first published if in fact no plagiarism was found by the trial court. Inasmuch as the trial court found that the evidence authorized a finding that there was no breach of contract and no plagiarism, these enumerations of error are not

meritorious.

4. Whether a witness or witnesses have been impeached by prior inconsistent statements, lies, distortions and misrepresentations, such testimony, as to its weight and credibility, is for the jury (the two judges as triers of fact in the case sub judice) and may be believed in part and disbelieved in part or totally disregarded. The witness may be believed no matter what effort may have been made to impeach him. *Solomon v. State,* 10 Ga. App. 469 (3) (73 SE 623); *Willis v. Henry,* 95 Ga. App. 593 (1) (98 SE2d 150); *Shannon v. Smith,* 96 Ga. App. 131, 137 (3) (99 SE2d 569); *Wynn v. Johns,* 97 Ga. App. 605, 607 (104 SE2d 150); *Travelers Insurance Company v. Miller,* 104 Ga. App. 554 (2a), 563 (122 SE2d 268); *General Trailer Services, Inc. v. Young Engineering, Inc.,* 149 Ga. App. 721, 722 (3) (256 SE2d 35).

Based upon the allowed evidence, this court cannot hold as a matter of law that the trial court abused its discretion as the trier of fact in believing or disbelieving the testimony of any witness claimed to have been impeached, and to hold that such testimony or evidence had no probative value. There is no merit in this complaint.

5. The adding or dropping of parties requires the exercise of discretion by the trial court. Code Ann. § 81A-121 (Ga. L. 1966, pp. 609, 632); *Robinson v. Bomar,* 122 Ga. App. 564, 567 (2) (177 SE2d 815); *Jenkins v. Chambers,* 127 Ga. App. 200, 202 (2) (193 SE2d 222); *Humble Oil & Refining Company v. Fulcher,* 128 Ga. App. 606, 609 (2) (197 SE2d 416). Compare *Weiss v. Gunter,* 144 Ga. App. 513, 515 (241 SE2d 623). Further, the motion must be timely, otherwise there is no abuse of discretion to deny it. *Jenkins v. Chambers,* 127 Ga. App. 200, 202 (2), supra. The motion to make the publisher a party does not appear to have been timely. There is no merit here.

6. Both the published work, *The Limner,* and an unfinished copy of same shown as Exhibit D-40, was offered and allowed in evidence over objection. Plaintiff now contends that there was error in allowing the exhibit in evidence inasmuch as it is not the purported original manuscript of *The Limner.* Of course, the material issue here is whether *The Limner* contains plagiarism and the Exhibit D-40 is offered to show it was virtually the same as the book later published except for rewritten portions thereof. It was identified at the trial as a photocopy of the original manuscript of *The Limner,* as first submitted to the publisher and prior to revision. A so-called "mystery box," claimed to be original writings of the book, *The Limner,* was found and produced by the defendant after he had closed his evidence in the trial and was offered in evidence during the final argument as possibly "the original manuscript." However, as it was not timely offered in evidence by the defendant, it was not allowed. Now plaintiff contends it is material as newly discovered

evidence. But it is offered merely for impeachment purposes to show that Exhibit D-40 is not the original manuscript. It was not discovered after rendition of the verdict but before the verdict. It fails to meet the requirements of Code § 70-204. At this point in time the plaintiff made no effort to offer same in evidence or to suggest that it be allowed in evidence, probably because it had not been examined by plaintiff's counsel. Under the circumstances, we do not find any harmful error in allowing Exhibit D-40 in evidence as it was properly identified. Further, we do not have a copy of same before this court for examination to compare the differences with the photocopy of the original manuscript, Exhibit D-40. Nor do we find that the trial court has abused its discretion in denying the motions for new trial and consideration based upon newly discovered evidence. See *West v. West,* 200 Ga. 115 (1) (35 SE2d 914); *Lakes v. Lakes,* 171 Ga. 692 (156 SE 620); *Bradley v. Bradley,* 232 Ga. 717, 718 (208 SE2d 817); *Henderson v. Metropolitan Atlanta Rapid Transit Authority,* 141 Ga. App. 509, 510 (233 SE2d 817); *Van Scoik v. State,* 142 Ga. App. 341 (235 SE2d 765). The enumerations of error concerned with Exhibit D-40 and the so-called "mystery box" offered as newly discovered evidence are not meritorious.

7. The remaining enumerations of error contend the trial court wrongfully excluded plaintiff's Exhibits 8 and 9, which were letters from another to the plaintiff. Plaintiff contends these letters are significant because they mention two items which were specifically referred to in *The Limner.* Exhibit 8 mentions a portrait of Charles Carroll. The "Carroll Portrait" is described and repeatedly mentioned in *The Limner.* Exhibit 9 mentions a Harvey Allen. In *The Limner* the protagonist's mentor is Professor Harvey Allan. Also, the writer of the letters was a professor. The significance of the letters which predate the events under litigation here is to show that these letters, about which plaintiff was not allowed to testify because of defendant's objection that the letters speak for themselves, demonstrates a congruity between items in plaintiff's life and items in *The Limner* which plaintiff testified she discussed with defendant prior to the time that defendant contends he had completed *The Limner.*

Unless the finder of fact believes that this congruence is coincidental an inference arises that the testimony of defendant that he had finished *The Limner* prior to having met the plaintiff is false. The trier of fact being thus authorized to have concluded that this portion of defendant's testimony was impeached would have been authorized to disbelieve the remainder of defendant's testimony. Code § 38-1806.

Although plaintiff's Exhibits 8 and 9 may have been first

identified by plaintiff with an intent to introduce these exhibits for another purpose they were eventually proffered as evidence disproving the facts to which defendant had testified. Under these circumstances, no foundation was required for admission of this evidence. *Deaton v. Swanson,* 196 Ga. 833, 834 (2), 837 (28 SE2d 126); *Waddell v. Cole,* 138 Ga. App. 15 (2) (225 SE2d 491); *Gilman Paper Company v. James,* 235 Ga. 348, 351 (219 SE2d 447); *Swift & Company v. Lawson,* 95 Ga. App. 35, 54 (6) (97 SE2d 168); *Harris v. State,* 96 Ga. App. 395, 401 (3) (100 SE2d 120). Code § 38-1802. These exhibits were admissible for the purpose of impeaching defendant's contradictory testimony. The trial court erred in excluding and failing to consider this evidence.

Accordingly, a new trial is required with proper consideration of the evidence. Our rulings above in Divisions 1, 2, 3, 4, 5, and 6 are all based on the evidence allowed to be admitted by the trial court. As Exhibits 8 and 9 were improperly excluded, had they been considered, the trial court might very well have disbelieved the defendant in part or entirely. A different judgment might have resulted.

*Judgment reversed. Smith and Banke, JJ., concur.*

Argued February 4, 1980 — Decided June 17, 1980 — Rehearing denied July 11, 1980 — ▄▄▄▄▄▄▄▄▄

*Emory A. Schwall,* for appellant.
*Richard N. Hubert,* for appellee.