## 68896. SPIVEY v. ROGERS et al.
### (326 SE2d 227)

BEASLEY, Judge.

This is the fourth appearance of this case in our appellate courts. Rogers was in arrears on his loans to the Tattnall Bank, and the Bank suggested that he sell some of his assets and bring his loans current. Rogers owned the San-Reid Apartments in Reidsville, Georgia. The Bank sought buyers for San-Reid and asked Bank officer Bradley if his half-brother, Spivey, would be interested. Spivey agreed to purchase a 95% interest in San-Reid with Rogers retaining a 5% interest. Three documents were executed on December 31, 1979; — a sales contract, a partnership agreement, and an employment contract. In the sales contract the purchase price was not to exceed $520,000, with $159,000 to be placed in escrow, from which all city, county and state taxes were to be paid, all past due installments on the property to the Farmers Home Administration (FmHA) would be paid, and also a sum would be paid to the Bank to obtain a release of a secondary security deed from Rogers to the Bank on San-Reid. The Partnership Agreement was between Rogers and Spivey for the purposes of owning and operating apartments, houses and apartment complexes, and such other businesses as may be agreed upon, with initial capital of the partnership in the amount of $24,000 to be deposited in a "partnership checking account by Levy John Spivey." Because Spivey contributed the entire capital account of the partnership, Rogers was not authorized to "withdraw any portion of the capital" without

Spivey's consent. The Employment Contract was for the hire of Bradley to operate and manage San-Reid.

Spivey borrowed $135,000 from the Bank and, with a personal check of $24,000, made a deposit of $159,000 in the San-Reid "Spivey-Bradley" account with the Bank. Bradley signed checks for amounts due under the sales agreement and transferred all funds to an escrow account of an attorney representing all parties. Later, an excess of $3,704.90 in the escrow account was transferred back to the San-Reid "Spivey-Bradley" account in the Bank.

Spivey agreed to assume the outstanding mortgage on San-Reid in the sales agreement, which agreement was to expire 60 days after December 31, 1979, the date of execution. It had been estimated that it would take two weeks by FmHA to approve the transfer of the San-Reid loan from Rogers to Spivey, but the application was denied in June 1980. On June 24, a second application was submitted to FmHA, with closing to be on or before August 1, 1980. On September 29 FmHA had not approved the loan application and Rogers withdrew his offer to sell San-Reid and notified Bradley and the Bank.

Rogers estimated that the nine-month delay in processing the transfer of the San-Reid loan had cost him from $50,000 to $60,000 in interest on his loan from the Bank ($120,000) and FmHA ($350,000). In February 1980 Rogers began depositing rentals from San-Reid in the "Spivey-Bradley" account in the Bank. On September 26 Rogers went to Bradley and asked for two checks to pay for maintenance at San-Reid. Both checks were signed in blank without the amount being filled in. One check was filled in with the correct amount, as agreed. The second check was filled in to withdraw all remaining funds in the account, $20,470.82, and made payable to the Bank on Rogers' indebtedness.

After the second application for transfer of the San-Reid loan had been submitted to FmHA for three months, Rogers contacted Curry, a lawyer and one of the Bank's directors. Curry agreed to loan Rogers $68,000 to be used to bring his loan with FmHA current. The Bank agreed to subordinate its second mortgage on San-Reid to Curry's loan and to repurchase Rogers' note from Curry if Curry so desired. The Bank agreed because the $68,000 was applied to reduction of the debt ahead of its mortgage and it was in no worse position.

Before Rogers withdrew the remaining $20,470.82 from the "Spivey-Bradley" account in the Bank, Spivey contacted the Bank's president and executive president and an FmHA official to discuss this matter. The Bank president testified that the gist of his conversation with Spivey was that Spivey asked the Bank "not to lend him [Rogers] any additional money . . . We were advised it probably would be litigation if, if Mr. Rogers was bailed out or anything . . . what he was trying to tell us that it seemed to me was that if we did

loan Mr. Rogers any more money that we were likely to get into some sort of litigation." This conversation was followed up by a letter to the president of the Bank, dated October 28, 1980, with copies to Curry, Bradley, and Spivey's lawyer, stating that FmHA had advised Spivey that Rogers would be directed to bring his note current by November 3 to avoid foreclosure. Spivey stated that it would not be ethical or fair for the Bank, its officers, or directors to assist Rogers "financially, directly or indirectly, to bring the note current, giving him incentive to avoid closing the agreement initially structured by" the Bank president and Bradley, a Bank officer.

After Rogers had withdrawn the $20,470.82 from the "Spivey-Bradley" account, Spivey contacted the Executive Vice-President of the Bank. He testified that "Spivey was very upset. He was quite mad and he had some very unkind things to say about, about Mr. Rogers. He, if I'm not mistaken used the word 'thief' and that he had stolen his money." Spivey told him he had talked with Paul Purcell, of FmHA, and told him "Theron [Rogers] had robbed a bank and had gotten hold of some cash and was going to try to save the, save his apartments." Spivey "wanted us [the Bank] to do whatever was necessary to get the apartments, to foreclose on the things, to make Theron return the money and go through with the deal or foreclose on him . . . his position was he expected and demanded that the Bank do whatever it was within its power to do to force Mr. Rogers to go through with the original agreement." He further testified that because of Spivey's actions and the statements he made to the Bank, Rogers' credit standing with the Bank had deteriorated. Rogers had applied for a loan from the Bank following this episode and had been turned down. Curry testified that he took the letter from Spivey as a "threat." After he received the letter and litigation started he demanded the Bank take over Rogers' note executed to him.

Spivey brought this action against Rogers and Tattnall Rentals, Inc., for specific performance of the sales contract, or in the alternative, damages for its breach. Rogers counterclaimed for tortious interference with business property and defamation. Rogers' motion for summary judgment on Spivey's complaint was granted by the trial court on both counts. The Supreme Court affirmed. *Spivey v. Rogers*, 249 Ga. 179 (288 SE2d 555) (1982). Thereafter, appeal was taken from an order dismissing Spivey's cross-action against the Bank and this Court dismissed the appeal as premature. *Spivey v. Rogers*, 167 Ga. App. 729 (307 SE2d 677) (1983).

Because of the failure of Spivey to make any payments upon the $135,000 note, the Bank brought an action against Spivey and the two guarantors, Bradley and Rogers. The Bank's motion for summary judgment was granted. On appeal, this court affirmed. *Bradley v. Tattnall Bank*, 170 Ga. App. 821 (318 SE2d 657) (1984).

Now Spivey appeals from a jury verdict and judgment for Rogers on Rogers' counterclaim in the suit originally brought by Spivey, and from the order dismissing his cross-action against the Bank.

The Bank was not an original party. During the course of the litigation, the court enjoined Rogers and Tattnall Rentals, Inc., from making any sales of San-Reid to anyone other than Spivey and ordered that all monies received from San-Reid be deposited in the Bank and not withdrawn except for the operation of San-Reid. Shortly after that order, Rogers asked for amplification of that portion which provided the purposes for which funds might be disbursed for the account at the Bank. The court on January 9, 1981, spelled this out and further ordered, without any party's motion, that the Bank and Curry: "are hereby determined necessary parties to this action and are hereby made parties hereto. Pleadings shall be filed within fifteen (15) days by such parties setting forth their claims. Existing parties are allowed ten (10) days additional in which to respond."

The Bank complied, apparently without service of process. Its pleading is not in the record before this court. Reference is made to it being filed on January 22, 1981. On February 12, 1981, Spivey filed a response to "the Bank pleadings," also referring to "the Pleadings of joinder Plaintiff," answering each paragraph of that pleading and then alleging a "cross-action" in four counts.[1]

On March 2, 1981, the Bank, designated as "joinder Plaintiff and cross claimant," moved for dismissal of Spivey's answer to the Bank's pleading and cross-action. The ground asserted was that it was late, 12 days after the time allowed by the court for filing responses. The Bank did not otherwise respond to the "cross-action" but as "Joinder Plaintiff and Cross Claimant" moved for summary judgment on its pleading against defendants Rogers and Tattnall Rentals, Inc., and against plaintiff Spivey.

On May 19, 1981, the court entered a further order clarifying disbursement of funds from the account at the Bank; it styled the Bank as a "court-ordered party" and not as a plaintiff or defendant. Later in May, the court entered another order regarding the "Spivey-Bradley" account and required that a *new* account be created specifically for rentals from San-Reid and their disbursal under court plan; that order styled Tattnall Bank as a defendant.

In June 1981, the Bank moved to be "realigned" as a party defendant on the ground that its status was unclear and that the only "claim" against it had been asserted by Spivey and it had no claims

---

[1] Defendants Rogers and Tattnall Rentals, Inc., filed an "answer . . . to Intervention of The Tattnall Bank" on February 4, 1981, responding to each paragraph of the Bank's "intervention."

to assert against defendants Rogers and Tattnall Rentals, Inc. It also moved to disburse funds and, in April 1982, for summary judgment.

On October 15, 1982, Spivey filed an amended complaint and amended answer and cross-action against the Bank, which actually were substitutes for the original pleadings. The Bank did not respond.

In March 1983, the court entered an order granting the Bank's motion to dismiss and releasing it as a party, having first noted that the Bank had been named a party by the court on its own motion after it appeared that monies the Bank had loaned both parties had been tied up by the litigation and the court wished to preserve the funds and have them paid into the court's registry. It reiterated its July 1981 opinion: "However, the issues between Spivey and the bank are not now expressly decided. The Tattnall Bank disclaims any interest in the controversy between Spivey and Rogers except its need to protect loans made to Rogers and Spivey, individually and together." The court also noted that the Bank had filed a separate action against Spivey and Rogers to enforce repayment of the overdue note. In that suit, Spivey counterclaimed and made virtually the same claims against the Bank, also in four counts, as he sought to pursue in the "cross-action."[2] *Held*:

1. We turn first to the issues involving the Bank. The court may order joinder in certain circumstances. OCGA § 9-11-19 (a). This provision contemplates that the party joined should be designated as a plaintiff or defendant. That was not done in this case. Finally, after Spivey had filed a "cross-claim" and after the Bank had been referred to as a "plaintiff," the Bank asked that it be "realigned" as a defendant. No action was taken on this. Instead, the court dismissed the Bank pursuant to the latter's motion.

Parties may be dropped by order of the court on motion of any party, to cure joinder error. OCGA § 9-11-21; *Freeman v. Low X-Ray Corp.*, 130 Ga. App. 856 (204 SE2d 803) (1974). Substantive correctness of joinder is to be tested under other pertinent rules including OCGA § 9-11-19. *Freeman v. Low X-Ray Corp.*, supra. Adding or dropping of parties requires exercise of discretion by the court. *Humble Oil &c. Co. v. Fulcher*, 128 Ga. App. 606 (197 SE2d 416) (1973); *Cartin v. Boles*, 155 Ga. App. 248 (270 SE2d 799) (1980). Addition of a party or change of status must be by leave of court. *Robinson v. Bomar*, 122 Ga. App. 564 (177 SE2d 815) (1970) (overruled on other grounds, *Robinson v. A. Constr. Co.*, 132 Ga. App. 591, 592 (208 SE2d 605) (1974); *Leggett v. Benton Bros. &c. Co.*, 138 Ga. App. 761 (227 SE2d 397) (1976)); *Pascoe Steel Corp. v. Turner County Bd. of Edu-*

---

[2] That suit thereafter was concluded and is reported on appeal as *Bradley v. Tattnall Bank*; *Spivey v. Tattnall Bank*, 170 Ga. App. 821 (318 SE2d 657) (1984).

*cation,* 139 Ga. App. 87 (227 SE2d 887) (1976). Plaintiff must obtain leave of court for filing an amendment seeking to make a new party defendant and obtain an order to that effect. *Pascoe Steel Corp. v. Turner County Bd. of Education,* supra. To add a party by amendment pursuant to OCGA § 9-11-15, leave of court must first be sought and obtained under OCGA § 9-11-21. *Aircraft Radio Systems v. Von Schlegell,* 168 Ga. App. 109 (308 SE2d 211) (1983).

OCGA § 9-11-13 (g) controls cross-claims and provides that they may be made against a co-party under certain circumstances. Here, the Bank had merely been added by the court to protect certain funds. It had not been added as a plaintiff, so Spivey could not avail himself of OCGA § 9-11-13 (g) because the Bank was not brought in as a plaintiff and Spivey did not move that the Bank be made a plaintiff. Later, when the Bank asked to be "realigned" as a defendant because its status was unclear, there was no order making it a defendant either. Spivey then filed an amended "cross-action," which would not lie because the Bank was never made a plaintiff.

Nor could it be regarded as a counterclaim because the Bank was never made a defendant by court order and Spivey never moved for such to be done so that its "cross-action" could be treated as a counterclaim. If he had sought to make the Bank a defendant under OCGA § 9-11-21, he also would have had to obtain permission of the court to add his counterclaim because he would have acquired it after his original complaint was filed, since he did not seek to sue the Bank originally. OCGA § 9-11-13 (e); *Jenkins v. Martin,* 142 Ga. App. 573 (236 SE2d 542) (1977).

Moreover, the "cross-claim" was filed too late to begin with, as pointed out by the Bank as the ground of its motion to dismiss it. A court is authorized to strike pleadings for failure of plaintiff to comply with the court's order. OCGA § 9-11-41 (b), (c). Plaintiff had not sought any extension of time.

We find no error in the trial court's grant of the motion to dismiss the Bank, which resulted in Spivey not being able to pursue his "cross-action."

2. Second, as to Rogers' counterclaim, which had been reserved by the court for jury determination, enumerated as error on the issue of tortious interference with business is that the trial court erred in failing to direct a verdict for Spivey, that the verdict is contrary to law, without evidence to support it and against the weight of the evidence. An appellate court passes on the sufficiency of the evidence, not its weight. *Williams v. Stankowitz,* 149 Ga. App. 865, 866 (256 SE2d 147) (1979). On appeal this court is bound to construe the evidence with every inference and presumption being in favor of upholding the jury's verdict. *Felton v. Mercer,* 149 Ga. App. 358 (1) (254 SE2d 398) (1979).

" '[A] person's business is property in the pursuit of which he is entitled to protection from tortious interferences by a third person, who, in interfering therewith, is not acting in the exercise of some right, such as the right to compete for business,' . . . 'Every individual has a natural right to pursue a lawful occupation and to conduct his business according to his own plans and policies, where he does not offend the law or unlawfully infringe upon the rights of others.' " *NAACP v. Overstreet*, 221 Ga. 16, 21 (1) (142 SE2d 816) (1965), cert. dis. 384 U. S. 118; reh. den. 384 U. S. 981. "Malicious injury to the business of another will give a right of action to the injured party." *Southern R. Co. v. Chambers*, 126 Ga. 404 (1) (55 SE 37) (1906). "The term 'malicious' used in this connection, is to be given a liberal meaning. The act is malicious when the thing done is with the knowledge of the plaintiff's rights, and with the intent to interfere therewith." *Employing Printers Club v. Dr. Blosser Co.*, 122 Ga. 509, 519 (50 SE 353) (1905); accord *Wise v. State Bd. of Architects*, 247 Ga. 206 (3) (274 SE2d 544) (1981), cert. dis. 454 U. S. 804.

The evidence recited above is sufficient to support the findings of the jury. As the verdict and judgment are supported by the evidence, the court did not err in denying Spivey's motion for directed verdict. *Bodge v. Salesworld, Inc.*, 154 Ga. App. 65, 66 (267 SE2d 505) (1980).

3. It is contended that the court erred "in instructing the jury that the partnership agreement between Spivey and Bradley terminated on August 1, 1980." The court charged the jury that "in a previous litigation [*Spivey v. Rogers*, 249 Ga. 179, 180, supra] the courts have determined that the contract actually expired on August 30th, 1980, and this court has ruled today, on a motion that the partnership agreement was so interrelated with the contract, that after the date of August 30th, 1980, that there was no partnership agreement insofar as it affected the apartments that have been referred to in this litigation."

The difference in the dates in the transcript and that cited in the enumeration and in *Spivey*, supra, is not material. What is critical is that the error enumerated contains words taken out of the context in which they were used. What the court instructed was that since the contract between Rogers and Spivey for the sale of San-Reid expired in August 1980, the partnership agreement did not affect San-Reid, which was the focal point of this litigation. We find no error in the instruction as a whole.

4. The enumerations of error relating to the charge on wrongful and malicious injury to another person's business (*American Oil Co. v. Towler*, 56 Ga. App. 866 (1) (194 SE 223) (1937)), and the prohibition against disturbing another person's business for the sake of compelling him to do an act contrary to his best interests (*Dale v. City Plumbing &c. Co.*, 112 Ga. App. 723, 727 (146 SE2d 349) (1965)), are

without merit.

5. The court correctly charged on the issue of tortious interference with business and then charged "if you find in favor of the plaintiff Rogers and against the defendant Spivey, for an amount of money, for the alleged tortious interference of business, you would then be authorized to consider additional damages as attorney fees." This is an incorrect statement of the law.

Attorney fees are recoverable only where authorized by some statutory provision or by contract. *Money v. Thompson &c. Co.*, 155 Ga. App. 566, 567 (271 SE2d 699) (1980). Expenses of litigation, including attorney fees, are generally not allowed as a part of the damages, but where plaintiff has specially pleaded and made a prayer that the defendant "has acted in bad faith . . . has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." OCGA § 13-6-11.

Here, the plaintiff specifically pled for attorney fees alleging that Spivey's actions "were in the utmost bad faith," but the court failed to charge on the issue of bad faith, or any other section of the statute which would have authorized a jury verdict on attorney fees. To the contrary, the court's charge authorized imposition of attorney fees solely upon a finding for the plaintiff on the issue of "tortious interference of business . . ." In effect, this charge permitted plaintiff to recover attorney fees as a concomitant expense of litigation on the issue of tortious interference of business — rather than the issue of the statutory ground alleged — "bad faith." Since the judgment as to attorney fees is not sustainable, the amount found must be written off; otherwise the judgment must be reversed.

6. The court's charge that "evidence of wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences," would authorize "punitive or exemplary damages and attorney's fees" is a correct statement of the law if "attorney's fees" are excised therefrom. *Ford Motor Credit Co. v. Spicer*, 144 Ga. App. 383, 387 (241 SE2d 273) (1977); *Ga.-Carolina Brick &c. Co. v. Brown*, 153 Ga. App. 747, 749 (266 SE2d 531) (1980); *Southern Bell &c. Co. v. Coastal Transmission*, 167 Ga. App. 611, 614 (307 SE2d 83) (1983). Since we have found that the verdict and judgment must be reversed as to attorney fees, and we do not find the charge as a whole to be misleading or confusing as to the issue of exemplary damages, we find no prejudice to the defendant as to this charge.

7. The remaining enumeration of error is rendered moot by our holding as to attorney fees.

*Judgment affirmed on condition. Birdsong, P. J., concurs. Carley, J., concurs in the judgment only.*

Decided December 5, 1984 —
Rehearings denied December 20, 1984 and January 3, 1985 —

*Joel E. Williams, Jr., M. Francis Stubbs,* for appellant.
*Richard D. Phillips, Bobby T. Jones,* for appellees.