## 73348. VITNER et al. v. FUNK.
### (354 SE2d 666)

BEASLEY, Judge.

Plaintiff Funk brought a multi-count complaint against the three doctors with whom he practiced, a professional association, North Atlanta OB-GYN, in which he and two of the defendants had owned equal shares, and a corporation, Birthing Center of Atlanta. Despite several counts the complaint focused on two issues: 1) the failure of the two doctors, Vitner and Levine, who had equal shares of North Atlanta with Funk, to abide by and comply with the terms of their share repurchase agreement; 2) Funk's exclusion from his alleged share in a project carried on by him and the other three doctors which culminated in the formation of Birthing Center, a corporation in which Funk was given no interest.

Subsequent to answering, defendant moved to sever the two issues pursuant to OCGA § 9-11-21. This motion was denied and after protracted discovery the issues were tried together before a jury which returned special verdicts basically favoring the plaintiff. In conformity with the verdict, judgment was entered on the share repurchase agreement issue of $55,790 actual damages, $40,367 interest and $20,000 cost of litigation; on the birthing center issue $40,000 actual damages.

Funk, Vitner, Levine and Wolfson practiced obstetrics and gynecology under the title of North Atlanta which was owned equally by Funk, Vitner and Levine. The four doctors also made mutual investments under Triple S. Although Triple S was their investment vehicle, arrangements were very informal with each individual participating as to each separate investment in any amount he might choose.

Starting in 1979 the parties became interested in the concept of creating a birthing center for deliveries by midwives. Over the next two years the doctors employed experts for a project feasibility report, paid by North Atlanta, engaged financial expertise and clout in the person of Harlan Allen who was granted one-third share of the project, the doctors retaining the remaining two-thirds, and contracted to purchase the land for the center, the earnest money being supplied again by North Atlanta. Each doctor contributed such time and effort as he was able, Vitner the most since he headed coordination of the venture. Funk was next in expenditure of time. All the doctors contributed financial support and assumed individual responsibility on various notes and loans as required.

In May of 1981 Funk decided to withdraw from North Atlanta,

and verbally communicated his intention to Levine. He gave written notice on July 1 that he was leaving as of July 31. He continued to participate fully in the task of creating the birthing center. In order to effectuate the plans and to minimize tax consequences, during the fall of 1981 it was decided to create two business entities: a limited real estate partnership to hold the land (later called 830 Douglas Road) and an operating Corporation (later called the Birthing Center). In January 1982 the land purchase was closed and under the 830 Douglas Road agreement Allen had one-third share and the four doctors the remaining two-thirds. However, when the Birthing Center was formally incorporated in the summer of 1982, Allen held one-third share and the remaining two-thirds was shared by the three defendant doctors. Funk was not included. This formed the basis for the Birthing Center issue in that Funk sought either the imposition of a constructive trust or damages for the wrongful deprivation of his interest in the joint project.

Under the share repurchase provision of the North Atlanta organization agreement Vitner and Levine were to repurchase Funk's shares at book value, within 90 days of his departure. It was not until over a year later after prodding by Funk's counsel that an offer of $37,900 was made. It was rejected as being an incorrect computation of the amount due Funk, who contended that the specified method was not properly used and a much greater sum was owed. The agreement also provided for imposition of interest at prime plus one percent, which was agreed by the parties at trial to be 19%. This was the share repurchase issue in which Funk sought the amount owed him plus interest.

As to both issues Funk sought the imposition of costs of litigation under OCGA § 13-6-11 for bad faith, stubborn litigiousness and unnecessary trouble and expense. The court struck stubborn litigiousness and the jury denied any recovery under OCGA § 13-6-11 as to the Birthing Center, imposing litigation costs only as to the share-repurchase claim.

1. Defendants contend the trial court erred in declining to sever the case and try the two major issues separately.

Although the motion was predicated on OCGA § 9-11-21, there are two other code sections which address severance or separate trials of different claims, parties or issues. See OCGA § 9-11-20 (b) and OCGA § 9-11-42 (b). The parties have argued all three, plus OCGA § 9-11-42 (a). That section is clearly inapplicable since it applies to the consolidation of separate actions, not the separation or bifurcation of claims or issues in one case. 9 Wright, Fed. Practice & Procedure (2d ed.), §§ 2381 & 82, p. 252.

Since all the sections involve the discretion of the trial court, *Chicago, R. I. &c. R. Co. v. Williams*, 245 F2d 397, 404 (8th Cir.

1957),[1] and particularly since OCGA § 9-11-42 (b) is the lodestar in this area, 7 Wright, Fed. Practice & Procedure (2d ed.), § 1660, p. 437, and 3A Moore's Fed. Practice & Procedure, § 20.08, p. 20-90,[2] we approach this issue with the concepts of Section 42 (b) as our primary guide, while also considering section 21.[3]

Contrary to the assertions of defendants we do not find two very separate, compartmentalized issues here. The factor that escalated the controversy from which our two issues evolved was Funk's decision to leave the group. It is clear that from that point on at least two of the defendants believed that he should no longer participate in their investment plan for the birthing center. We recognize fully that as to the share-repurchase issue the matter involved Vitner and Levine, while the birthing center concerned two other individuals, Wolfson and Allen, plus the corporate entity Birthing Center. However, Vitner was the principal mover in both areas and Levine was vitally concerned with both. Even Wolfson as the prospective successor to Funk in North Atlanta was not uninterested. Plus, North Atlanta was being used as a conduit to fund or furnish seed money for the birthing center. There was considerable spillover in both directions as to these two issues. Certainly there was no misjoinder of the parties.

Defendants argue that in retrospect one can see that the issues should have been divided and that prejudice resulted from their confusion; that evidence not admissible in a separate trial was permitted, causing untold damage to defendants. From our perspective it seems obvious that the jury needed to be presented with the entire panorama, in order to understand the root cause of the claims. While it might be an exaggeration to describe the events here as one all encompassing transaction, there exists a very connected and related series of transactions, so that the issues arising from them were properly submitted to one jury and it was not error to refuse to bifurcate

---

[1] Section 20 (b): *Sudderth v. Nat. Lead Co.*, 272 F2d 259, 261 (5th Cir. 1959); *Hertz Corp. v. Cox*, 430 F2d 1365, 1372 (4th Cir. 1970). Section 21: *Humble Oil & Refining Co. v. Fulcher*, 128 Ga. App. 606, 609 (2) (197 SE2d 416) (1973); *Cartin v. Boles*, 155 Ga. App. 248, 254 (5) (270 SE2d 799) (1980). Section 42 (b): *Lansky v. Goldstein*, 141 Ga. App. 345 (1) (233 SE2d 437) (1977); *McGowan v. North Ga. Production Credit Assn.*, 246 Ga. 135 (1) (269 SE2d 25) (1980).

[2] As stated in *Wright*: "Aside from emphasizing the availability of separate trials, Rule 20 (b) has little significance inasmuch as the power granted the court therein also is provided by the much broader grant of discretion set forth in Rule 42 (b)."

[3] A thorough discussion of the distinction between 21 and 42 (b) is found in *Roddy & McNulty Ins. Agency v. A. A. Proctor & Co.*, 16 Mass. App. 525 (452 NE2d 308 (1983), which holds: "[S]everance under rule 21 may be principally directed to the separation of claims within multiclaim litigation because of the peculiar relationship or status of parties with respect to particular claims . . . [See 3A Moore's Federal Practice and Procedure § 21.05 (2), p. 21-37.] Rule 42 (b), on the other hand, appears to be devoted to the convenience of adjudication, the avoidance of prejudice and the interests of expedition and economy as dictated by the characteristics and elements of proof of the claims themselves."

them.

"Severance is largely a matter of discretion for the trial judge, and absent clear and manifest abuse of that discretion, it will not be interfered with on appeal." *Wheels & Brakes v. Capital Ford Truck Sales*, 167 Ga. App. 532, 533 (1) (307 SE2d 13) (1983).

2. Defendants assert error on the failure to direct a verdict in their favor regarding the birthing center issue. The principal argument is there was no fiduciary relation and no contract so that they were under no obligation to share the end product with Funk.

Defendant urges the principle that a confidential relationship does not exist prior to the contract or legal relationship. *Cole v. Cates*, 113 Ga. App. 540, 544 (2) (149 SE2d 165) (1966). Then relying upon the premise that no relationship was created until the Birthing Center was incorporated, it is argued that Funk was omitted from participation in that entity and therefore no relationship existed as to all the prior transactions of the parties.

Because their premise is invalid we do not reach the same conclusion as defendants. *Cochran v. Murrah*, 235 Ga. 304, 307 (219 SE2d 421) (1975) construed what is now OCGA § 23-2-58 and found it "does not attempt to comprehensively enumerate the cases wherein the relation of mutual. confidence is present. The showing of a relationship *in fact* which justified the reposing of confidence by one party in another is all the law requires." This issue will be discussed in more detail. At this point, it is sufficient to hold that the entire business structure of the parties, their interactions and dealings over the course of several years and their common goal, all furnished a basis for a jury to find a relationship in fact which justified the reposal of confidence on the part of one party and good faith on the part of the others.

We also find no persuasive logic in defendant's argument that the necessary elements of a valid and enforceable contract were lacking because there was no meeting of the minds and no mutuality, citing *Malone Constr. Co. v. Westbrook*, 127 Ga. App. 709 (194 SE2d 619) (1972); *Clayton McLendon v. McCarthy*, 125 Ga. App. 76 (196 SE2d 452) (1971).

There is ample evidence to sustain a finding that the parties embarked on a joint enterprise, share and share alike. This joint endeavor technically might be described as a joint venture or partnership but in this instance, as in most, the distinction is not crucial and the same general rules apply. See *Fulton Nat. Bank v. Didschuneit*, 92 Ga. App. 527, 532 (88 SE2d 853) (1955); *Boatman v. George Hyman Constr. Co.*, 157 Ga. App. 120, 123 (276 SE2d 272) (1981) which stated: "we may *treat* the joint venture as a partnership composed of the adventurers without deciding they are partners." A partnership may be created by a written or parol contract or may arise from the

joint ownership and use of undivided property. OCGA § 14-8-22. It "may result from an express agreement that the relationship shall exist, or by implication from certain other agreements which the parties have made." *Butler v. Frank*, 7 Ga. App. 655, 656 (1) (67 SE 884) (1910).

From our review of the transcript we find evidence that the parties assumed the role of incorporators or "promoters" and as such acquired the rights and responsibilities commensurate with their status. See 18 AmJur2d 955, Corp., § 143 et seq. One need only point to their course of dealing, using their investment vehicle Triple S, their professional entity North Atlanta, their individual and collective resources, their plans and the steps taken to achieve fruition, all bound as a unit in order to reach a common goal: the creation of a birthing center.

Defendants' arguments as to no precise document implicate the statute of frauds' requirement that certain contracts be in writing. OCGA § 13-5-30. However, it is inapplicable to an agreement for an indefinite period terminable at will, *Brazzeal v. Commercial Cas. Ins. Co.*, 51 Ga. App. 471 (180 SE 853) (1935), or where there is a possibility of performance in one year, *Klag v. Home Ins. Co.*, 116 Ga. App. 678 (158 SE2d 444) (1967), or where there has been part or full performance on one side. OCGA § 13-5-31. Of course, acts which are merely preparatory or preliminary to the performance of a contract are not enough, but performance which is substantial and essential to the contract and results in benefit to one party and detriment to the other do obviate the statute. *Utica Tool Co. v. Mitchell*, 135 Ga. App. 635, 637 (218 SE2d 650) (1975); *Metzgar v. Reserve Ins. Co.*, 149 Ga. App. 404 (254 SE2d 517) (1979). Plaintiff supplied consideration and performance far in excess of those acts which are purely preparatory. He was involved right up to the culmination of the project, the incorporation of Birthing Center, and then was denied the fruits of his performance.

It was not error to submit the issue to the jury.

3. Defendants contend their attorney fees were not authorized because there was no evidence of bad faith on their part or that the plaintiff was caused unnecessary trouble and expense.

"[T]he elements of bad faith which will authorize expenses of litigation in an ex contractu action are those acts relative to the conduct of entering into a contract or to the transaction and dealings out of which the cause of action arose . . . , but do not have reference to the motive with which the defendant defends an action after a cause of action has occurred." *Edwards-Warren Tire Co. v. Coble*, 102 Ga. App. 106, 113 (115 SE2d 852) (1960). Bad faith can occur in carrying out the provision or obligations of the contract. *Felder v. Paulk*, 165 Ga. 135 (6) (139 SE 873) (1927). As stated in *Edwards-Warren*, supra

at 114: "We construe 'transactions and dealings out of which the cause of action arose' to mean not only the negotiation and formulation of the contract, but also included is the performance of the contractual provisions." Thus bad faith in a contract's breach may authorize the expenses of litigation.

Here the defendants did not reimburse plaintiff within 90 days and in fact through various excuses avoided payment for over a year. When a sum was tendered it did not include interest and it was arrived at by methods, not contained in the share repurchase agreement, which served to reduce the amount owed. The basic theme seemed to be to avoid or at least delay the contractual obligation as long as possible. Based on the evidence the jury was authorized to find defendants acted in bad faith and caused plaintiff unnecessary trouble and expense. *St. Holmes v. St. Holmes*, 169 Ga. App. 283, 284 (2) (312 SE2d 370) (1983).

4. The last enumeration of error by defendants complains that the interest should not have been added to the entire sum of $55,790 awarded under the share repurchase agreement. Defendants contend that the tender of $37,900 made in 1982 should have stopped the running of interest on that sum and interest should have only been calculated on the balance of approximately $18,000 from that time until trial.

"It is a general rule that a tender must be certain and unconditional, and must be in full of the specific debt; and, in order to prevent the running of interest, the tender must be continuing. The fact that it may be made and refused is not sufficient to stop the running of interest. It must appear that the party making the tender has at all times been ready, willing, and able to pay the amount tendered." *Bank of LaFayette v. Giles*, 208 Ga. 674, 680 (4) (69 SE2d 78) (1952). See *Fitzgerald v. Vaughn*, 189 Ga. 707, 710 (7 SE2d 78) (1940), which observed that while a declaration which is the equivalent of a refusal to accept tender if made will excuse a formal tender, it will not stop the running of interest. The court noted: "The refusal of a tender does not harm the tenderer. He still has the use of the money which by his tender he admitted that he owed the other party. If he does not wish to use this money and wishes to avoid the payment of interest, he can keep the tender good by holding the money ready for payment at any time the other party wishes to accept it." *Fitzgerald*, supra at 710. The court in *Bank of LaFayette* advised: "In order to avoid the payment of future interest, the plaintiff should have paid into the registry of the court the entire principal and interest due. . . ." Supra at 680.

Defendants did not tender the full amount due plus interest and did not make the offer a continuing one or pay the sum into the registry of the court. The running of interest was not stopped and the

amount due was correctly calculated.

5. Funk's motion to impose penalties for a frivolous appeal, OCGA § 5-6-6, is denied. *Prattes v. Southeast Ceramics*, 132 Ga. App. 584, 586 (3) (208 SE2d 600) (1974).

*Judgment affirmed. Deen, P. J., and Benham, J., concur.*

DECIDED MARCH 4, 1987.

*Bruce W. Callner, Kathy L. Portnoy*, for appellants.
*Richard P. Reinhart, Thomas T. Tate*, for appellee.