70346, 70732. STERN'S GALLERY OF GIFTS, INC. v. CORPORATE PROPERTY INVESTORS, INC.; and vice versa.
(337 SE2d 29)

DEEN, Presiding Judge.

For nearly ten years appellant Edwin Stern, then incorporated as E. H. Stern, Inc., operated a successful card and gift shop in a neighborhood shopping center on West Paces Ferry Road in Atlanta. In 1974 he was approached by a leasing agent of Lenox Square, Inc. (Lenox), relative to opening a similar store at the Lenox Square regional mall. Stern agreed to do so, phased out the operation at his original location, and opened for business at Lenox in October of that year, closing the original store approximately three months thereafter.[1]

---

[1] Stern had recently been divorced and desired to sever the landlord-tenant relationship

The ten-year lease with Lenox provided, *inter alia*, that he would pay in monthly installments a certain annual rental at a specified rate for his mall-level retail space and at a lower specified rate for a smaller plaza-level area which he would utilize for storage and for his mail-order catalog business; that when his retail sales (excluding those of the mail-order business) reached a certain volume his rental would increase by a fixed percentage of sales; that he would not sublet any of his space without the landlord's written consent; and that such consent could not be unreasonably withheld. The lease further provided for partial or total abatement of rent in certain circumstances wherein Stern's business might be partially or totally interrupted. Additionally, there was an arrangement whereby, for the first several years of his tenancy, Stern would actually pay each month less than the rental stated in the lease, the difference in the two amounts being treated as a loan (referred to as "deferred rental") which would become payable in subsequent years, after the business had presumably become well established and had amortized its start-up costs. According to the testimony of the person who was Lenox' manager at the time the lease was negotiated, Lenox had this arrangement with several tenants whose business it wished to encourage, with a view to their becoming high-paying tenants under the percentage-of-sales provision recited, supra. Stern's new business was incorporated as Stern's Gallery of Gifts, Inc.

Stern expended a considerable sum of money on remodeling and refixturing his new location. His patrons included not only former customers who followed him to his new store but also mall shoppers who passed his desirable location in great numbers, and, according to sales tax returns and other relevant documents, he enjoyed good sales from the commencement of the Lenox operation. In 1976 he spent approximately $82,000 on advertising, the greatest portion going to the production of an elaborate catalog designed to promote both mail-order sales and the new location of the retail operation. On October 15, 1976, ownership of Lenox Square passed from Lenox Square, Inc., to Corporate Property Investors, Inc., and its management subsidiary, Pembrook, Inc. (hereinafter collectively referred to as CPI).

Prior to moving into the new premises in the Fall of 1974, Stern had pointed out to Lenox' leasing agent evidence of leaks in the ceiling area and was assured that although there had been leaks, they had been repaired. In December 1976, at about the same time that roofers hired by the new management began installing a new roof,

---

with his former wife's father, who owned the West Paces Ferry shopping center. The fiscal year for Stern's Lenox Square operation ran from February 1 through January 31, but for simplicity's sake each fiscal year will hereinafter be designated by the calendar year in which fell eleven of the twelve months.

leaks began to occur with considerable regularity, causing damage to merchandise and to the store's interior. Each time there was a leak, CPI was promptly notified, and each time personnel came to clean up the premises and patch the ceiling, apparently stopping the leaks; but each time either the same leak recurred or a new one appeared. In January of 1977 there occurred leaks of such severity that large volumes of water (so great as to require that a fifty-five-gallon drum placed to catch the water be emptied several times daily) flooded the store, soaking the carpet, streaking the walls and ceiling, and damaging merchandise and fixtures in both the mall-level retail space and the plaza-level space. On the occasion of the last leak, which occurred January 27, the ceiling collapsed, producing extensive damage. After each leak parts of the store had had to be cordoned off or the store temporarily closed until necessary clean-up measures could be taken and merchandise displays rearranged. Customers desiring to use the rest room had to be provided an umbrella to shield them from falling water. A plastic sheet was placed across the store to divide the usable front area from the larger, now unusable, remainder of the retail space; this plastic sheet remained in place through the following August. Stern's meanwhile offered the damaged merchandise for sale at greatly reduced prices.

The record indicates that the former Lenox management had been aware for some time of the need for a new roof on the building in which Stern's was located, but had delayed having it replaced because of the pendency of the sale of the shopping center; and that, moreover, the urgency of the need for a new roof had been conveyed to the prospective new management both orally and in at least two letters. Approximately one month after new management took over, a contract for reroofing was let to Tip-Top Roofers. The reroofing method contracted for did not require removal of the old roof but only, after some preparatory work, the application of a new "membrane" over the existing roof. Work did not actually begin until about mid-December, and because of holidays and winter rains, was not completed until some time in February. It was while the reroofing was in process that the January series of catastrophic leaks occurred. During this time the mall's assistant manager at least twice urged the roofers to proceed more expeditiously, going so far as to suggest that work be done on Sundays and holidays to make up for the days lost to rain. Other stores in the same building sustained lesser water damage during this period, but the position of Stern's store relative to the slant of the roof and to certain old but currently unused openings in the roof caused the Stern store to receive the lion's share of the leakage and the ensuing damage.

After the January catastrophes Stern conferred almost daily with the shopping center's manager. He prepared a list of the merchandise

which was damaged in December and January and had to be discarded or sold at reduced prices, and also listed certain out-of-pocket expenses such as having the carpet shampooed and paying his staff for extra work necessitated by the incursion of water. He employed a consultant to prepare an itemized proposal for repair or replacement of damaged ceiling, walls, floors, fixtures, etc., together with an estimate of the time and costs required to implement the proposal and restock the store for business. According to Stern's testimony, the shopping center manager repeatedly acknowledged liability and urged Stern to formulate and submit his claim to CPI's insurer; the manager, however, denies that such conversations took place.

April passed, and no insurance payment had been made. The premises remained in disrepair, with the merchandise displayed in makeshift fashion. In the meanwhile, according to Stern's testimony, he either approached or was approached by at least two merchants (one already a Lenox Square tenant) regarding the possibility of subletting his space at a rate which would produce a profit for him. When Stern, pursuant to the lease provisions cited, supra, approached the mall's manager to ask for his consent to a sublease to one or another of these prospects, the latter replied that it was contrary to CPI's policy to sublease but that if Stern would submit a written proposal from one or more of the would-be subletters, he would consider terminating Stern's lease and allowing one of them to rent directly from CPI. Because such an arrangement would yield Stern no financial relief, he pursued the subletting idea no further.[2] Also in the meanwhile, both immediately prior to and during the period when Stern was attempting either to collect funds from CPI's insurer to finance the necessary remodeling or to arrange for a sublease, Stern was preparing, in accordance with a stipulation in his lease, to open a branch store in another location; according to Stern, this endeavor drained the funds which he might otherwise have advanced for the repair and remodeling of the Lenox Square store.

Ultimately, in response to Stern's almost daily inquiries, the mall's manager informed him that the insurer was of the opinion that his claim (based largely on the consultant's proposal, together with contractors' estimates for repair and redecorating and Stern's own list of his damaged merchandise and his out-of-pocket costs) was too high. In response to Stern's inquiry, however, the manager declined to specify which particular items were too high. The record indicates that CPI's insurer subsequently offered to settle for $25,000 Stern's claim of more than $50,000, and that Stern rejected the offer and ulti-

---

[2] The record shows that Stern's attorney contacted the manager regarding the possibility of Stern's subletting the premises, and that the latter wrote in reply that permitting a sublease was contrary to CPI's policy.

mately filed an action against CPI/Pembrook and also against Tip-Top Roofers and their respective insurers. The suit against the insurers was later dismissed without prejudice.

Stern's complaint alleged negligence against Tip-Top; and against CPI/Pembrook, negligence, breach of the leasing contract to maintain or repair the premises, and breach of the landlord's statutory duty of repair. Stern sought damages for each of these alleged wrongs and also for lost profits, loss of the value of the leasehold, and loss of the value of a going business. At the end of August 1977, approximately six weeks after filing the suit, he vacated his Lenox Square premises and went out of business.

CPI/Pembrook answered the complaint, denying appellant's allegations, crossclaiming against Tip-Top, and counterclaiming against Stern's for several thousand dollars in back rent allegedly due (Stern's had paid no rent since approximately April 21; the store was still in disrepair and the plastic sheet was still blocking the rear half of the selling space). CPI subsequently acknowledged that a portion of this sum consisted of deferred rentals which had accrued before ownership of the shopping center was transferred, and which therefore belonged to the previous owner; CPI dropped this portion of its claim. At the close of evidence, appellant moved for a directed verdict on the issue of appellee CPI's allegedly unreasonable withholding of consent to sublease; the trial court denied the motion. Stern attempted unsuccessfully to have admitted into evidence the consultant's report and proposal for renovation of the Lenox Square store.

The jury was instructed to return special verdicts in question-and-answer form. The jurors found CPI negligent and Tip-Top not negligent with regard to the roof, and further found that CPI's negligence was the proximate cause of Stern's damages. Further, the jury found that CPI as landlord had violated its statutory duty to keep the premises in good repair, and that such violation was the proximate cause of plaintiff's damages. On the issue of breach of lease agreement, however, the jury found that CPI had committed no breach of its contractual duty either by failing to keep the roof in good repair and to make repairs, or by unreasonably withholding consent for Stern to sublease the premises. On the damages issue, the jury further found damages in the amount of $10,000 with regard to merchandise, fixtures, equipment, and improvements (the amount submitted by Stern as his initial appraisal of damages and out-of-pocket expenses prior to retaining the consultant), but awarding nothing for lost profits or value of the leasehold. The jury also found that Stern had taken all reasonable steps to mitigate damages; that the landlord's actions or inaction with respect to repair or restoration of Stern's premises were wilful, wanton, and malicious; and that the plaintiff was entitled to punitive damages in the amount of $16,000. On the landlord's

counterclaim for rents allegedly due, the jury found that plaintiff had breached the lease agreement by failing to make rental payments and to make repairs to the interior of the store, and that the landlord was entitled to recover unpaid rent in the amount of $26,000 — an amount exactly equal to the total of damages awarded plaintiff. The net result of the verdict, of course, was a zero judgment for plaintiff.

CPI/Pembrook moved for judgment notwithstanding the verdict, contending that plaintiff was barred from recovery by certain exculpatory provisions in the lease. Stern then moved for a new trial on the general grounds, challenging the adequacy of the judgment in the light of the evidence adduced, and also on the ground that the verdict was "internally inconsistent, irreconcilable, and therefore illegal." The trial court denied these motions, and Stern's appealed from the judgment, enumerating as error the court's failure to direct a verdict on the allegedly unreasonable withholding of consent to sublease, and the insufficiency of the evidence to support the verdict awarding zero damages for lost profits. CPI filed a timely cross-appeal from the trial court's denial of its motions for directed verdict and for judgment notwithstanding the verdict on the issues of Stern's alleged failure to procure certain insurance and of the court's charging the jury on punitive damages. *Held*:

The painstaking but necessary detail with which the facts of this case are delineated above may have provoked in the reader a provisional diagnosis of legal logorrhea. Notwithstanding the risk of insuring such an accusation, the following evaluation of this case unfortunately demands commensurate volume.

1. On CPI's cross-appeal, we find no error in the trial court's charging the jury on punitive damages. It is the duty of the trial court to instruct the jury on matters pertaining to the issues raised by the evidence. Because there was evidence from which the jury was authorized to find wanton and wilful conduct on CPI's part with respect to the latter's refusal to reimburse Stern's for expenses necessitated by the leaking roof, a jury charge on punitive damages was appropriate. *Allmond v. Walker*, 172 Ga. App. 870 (324 SE2d 812) (1984).

2. As to CPI's enumeration of error regarding Stern's failure to procure certain insurance which CPI alleges was required by the lease agreement, our analysis of the record leads us to conclude that the type of insurance required under that agreement is not insurance against the landlord's negligence — that is, not as between the two parties to the lease, as CPI contends — but rather is insurance of the type which would protect both landlord and tenant against the claims of third parties. Because the dispute in the instant case is over the liability *vel non* of CPI, the landlord, to its tenant, Stern's, this contention is irrelevant to the facts of the case at bar. *Tuxedo Plumbing &c. Co. v. Lie-Nielsen*, 245 Ga. 27 (262 SE2d 794) (1980) and *Pettus*

*v. APC,* 162 Ga. App. 804 (293 SE2d 65) (1982), cited by cross-appellant, are factually distinguishable from the instant case.

The statutory criterion for granting either a directed verdict or a judgment notwithstanding the verdict is that "there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom[,] shall demand a particular verdict." The evidence in the case at bar did not meet this standard, and the trial court did not err in denying CPI's motions for judgment n.o.v. on these issues.

3. It is the general rule in this state, when the owner of a business seeks to recover lost profits, that recovery can be had only if the business has a proven "track record" of profitability. The jury is not permitted to speculate as to what the allegedly lost profits might have amounted to. *Southern Crate &c. Co. v. McDowell,* 163 Ga. App. 153 (293 SE2d 541) (1982). In the instant case Stern's had been in business in its new location for only slightly more than two years before the occurrence of the events which gave rise to the action below, and was therefore still within the period during which a business ordinarily operates at a loss until start-up costs have been absorbed. Although documents on file with this court show that Stern's had not yet shown an annual profit at the time the cause of action arose, they reveal that the firm was approaching the break-even point: in its first year of operation the loss was $13,000; in the second year, $3,000. In such circumstances it would perhaps be reasonable to project that, if the business continued to grow at the same rate, the firm would soon show a profit.

The jury in the instant case had before it evidence of the "track record" of appellant's business in its Lenox Square location — a record that as yet showed only a loss; the jurors determined, on the basis of that evidence, that appellant was not entitled to an award for lost profits. Appellant contends, however, that the *weight* of the evidence demands a verdict awarding lost profits. It is well settled that the appellate court must confine its review to the sufficiency of the evidence, not its weight. *Spivey v. Rogers,* 173 Ga. App. 233, 238 (326 SE2d 227) (1985). Moreover, this court is constrained to construe the evidence most strongly in favor of the jury verdict, *White v. Olderman Realty &c. Co.,* 166 Ga. App. 179 (303 SE2d 517) (1983), and not to disturb that verdict except upon a finding of no evidence to support it. *Kent v. Hunt & Assoc.,* 165 Ga. App. 169 (299 SE2d 123) (1983). There was evidence of record to support this jury's verdict, and we will not substitute our judgment for that of the factfinder. We must affirm the verdict on this issue and declare this enumeration to be without merit.

4. Although questions of reasonableness and unreasonableness are most often questions of fact requiring the consideration of the

jury, "[t]he construction of the provisions of [a] lease . . . is generally [a question] for the court to determine as a matter of law. OCGA § 13-2-1." *Peachtree on Peachtree Investors v. Reed Drug Co.*, 251 Ga. 692, 694 (308 SE2d 825) (1983). As a general rule the provisions of a contract will be construed against the draftsman, and those of a lease will be construed against the lessor. OCGA §§ 13-2-1; 13-2-2 (5); *Peachtree on Peachtree Investors*, supra; *Simmerman v. Dept. of Transp.*, 167 Ga. App. 383 (307 SE2d 4) (1983); *Farm Supply Co. v. Cook*, 116 Ga. App. 814 (159 SE2d 128) (1967). Where the language of a contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible. *R. S. Helms v. GST Dev. Co.*, 135 Ga. App. 845 (219 SE2d 458) (1975). The existence or non-existence of ambiguity is always a question of law for the court. *Salvatori Corp. v. Rubin*, 159 Ga. App. 369 (283 SE2d 326) (1981).

The lease contract between Stern's and Lenox Square, Inc., CPI's predecessor, contains the following provisions relevant to appellant's first enumeration of error. Article XIII, Section 1, reads as follows: "Tenant shall not assign or in any manner transfer this lease or any interest therein, nor sublet the leased premises or any part or parts thereof, . . . without the previous written consent of the Landlord." Article XX, Section 5, provides that all the covenants and other agreements of the lease shall be binding upon the parties and their heirs, successors, and assigns. Article XXI requires that "insofar as there is any conflict between the special stipulations . . . and the above and foregoing provision, the special stipulations shall be controlling." Special Stipulation # 8 states: "Landlord agrees that when under this lease provision is made for Tenant securing the written consent of Landlord, such written consent will not be unreasonably withheld."

Our reading of the cited terms of the lease contract compels us to conclude that no matters of fact are at issue here, and, moreover, that there exists no ambiguity in the contractual language except perhaps for the word "unreasonably." Under established principles of law, it would become the duty of the court to interpret or construe this single word. "Where no matter of fact is involved, the construction of a plain and definite contract, if needed, is a matter of law for the court. But a contract is not ambiguous, even where difficult to construe . . . unless and until an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties." *Crooks v. Crim*, 159 Ga. App. 745, 748 (285 SE2d 84) (1981); *Interstate Fire Ins. Co. v. Nat. Indem. Co.*, 157 Ga. App. 516 (277 SE2d 802) (1981). " '[E]ven ambiguous contracts may be construed by the courts, and a jury question is presented only when the application of the rules of construction fails

to resolve the ambiguity.'" *Andrews v. Skinner*, 158 Ga. App. 229, 230 (279 SE2d 523) (1981); *L. Gregg Ivey, Inc. v. Land*, 148 Ga. App. 667, 668 (252 SE2d 88) (1979). The construction and interpretation of a contract, being a matter of law for the court, may properly be disposed of by summary judgment. *Sims' Crane Svc. v. Reliance Ins. Co.*, 514 FSupp. 1033 (S.D. Ga. 1981), aff'd 667 F2d 30 (11th Cir. 1982). In interpreting a contract, the court is required by law to "give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an interpretation which leaves a part of such manifestations unreasonable or of no effect." Restatement (2d) of Contracts, p. 327, § 236 (a); OCGA § 13-2-2 (4); *Whitmire v. Colwell*, 159 Ga. App. 682 (285 SE2d 28) (1981).

Because there appear to be no Georgia cases directly on point (compare *Duff's Enterprises v. B. F. Saul Real Estate &c. Trust*, 170 Ga. App. 9 (316 SE2d 21) (1984)), we must look to our sister jurisdictions for examples of "reasonable" versus "unreasonable" withholding of a landlord's consent to subletting leased premises. When, as in the instant case, the subject lease contains not only a clause requiring the landlord's prior written consent to a sublease, but also a clause (alternatively, when there is a statute in effect) prohibiting unreasonable withholding of consent, the courts have construed the latter provision in one of two ways: either as an additional covenant on the part of the lessor or as a mere modification of the lessee's covenant not to sublet without the landlord's written consent. Those jurisdictions which have held such clauses to be mere modifications rather than separate covenants have generally ruled that a landlord may withhold consent for reasons personal or peculiar to himself. See 49 AmJur2d, Landlord & Tenant, § 43; 51C CJS, Landlord & Tenant, § 36 (1); 31 ALR2d 821; and cases annotated therein. Those jurisdictions, on the other hand, which have construed the clause as a covenant on the part of the lessor have held that the term "reasonable" cannot comprehend arbitrary or capricious reasons, or considerations based on such factors as race or religion or pecuniary gain, or merely personal preferences; they have held that the term "reasonable" must refer to considerations of fairness and commercial reasonableness. See, e.g., *Fernandez v. Vazquez*, 397 S2d 1171 (Fla. App. 1981); 31 ALR2d 835 and annotations.

The modern trend is clearly towards requiring "reasonableness" (as defined in the preceding paragraph) even when there is no clause expressly requiring that consent not be unreasonably withheld. During the past decade or so, at least three jurisdictions have enacted statutes prohibiting arbitrary refusal of consent with respect to certain leases: Delaware (1974), Alaska (1975), and New York (1981). Decisions from these and other jurisdictions reflect this trend; e.g., Alabama, Florida, Illinois, and Missouri. Even those jurisdictions which

have continued officially to adhere to the old majority rule have begun to evince recognition, if not adoption, of the other approach. See, e.g., *Haritas v. Goveia*, 188 NE2d 854 (Mass. 1963), cert. denied 375 U. S. 845 (1963) (landlord unreasonably withheld consent to subletting to reputable businessman; lessee would be entitled to damages incurred if he were forced to liquidate his business).

As long ago as 1909 the Missouri Supreme Court, considering a case in which the lease had no specific provision forbidding unreasonable withholding of consent, observed: "It is likely [the landlord's] refusal would have to stand on something better than mere caprice and whim. It is likely the law would compel such landlord to acquit himself by acting with reason, and that courts would hold that the contract implied he would so act." *Underwood Typewriter Co. v. Century Realty Co.*, 119 SW 400, at 403 (220 Mo. 522, 1909). See also *Broad & Branford Place Corp. v. J. J. Hockenjos Co.*, 39 A2d 80 (N.J. 1944). In *Homa-Goff Interiors v. Cowden*, 350 S2d 1035 (Ala. 1977), the landlord, upon learning the identity of the tenant's proposed subtenant, made a private arrangement to lease the premises directly to him at a somewhat lower rate than the current tenant had asked, and then refused to allow the tenant to sublet. The court noted the trend towards proscribing "arbitrary and capricious" withholding of consent and, in holding for the tenant, urged application of the "commercial reasonableness" standard. See also *Arrington v. Walter E. Heller Intl. Corp.*, 333 NE2d 50 (30 Ill. App. 3d 631, 1975), which the Alabama Supreme Court followed in *Cowden*, supra. In neither case was there a clause prohibiting unreasonable withholding of consent. It is significant, in the light of the holding in *Cowden*, supra, that in the instant case the shopping center manager testified that he would have considered a certain Mr. Bounds (who at the time occupied Lenox Square space and was one of the persons who had discussed with Stern the possibility of subleasing Stern's space) as a tenant, but not as subtenant, of the premises then leased to Stern.

In *Beck-Klein v. Solow Mgt. Corp.*, 460 NYS2d 462 (118 Misc.2d 317, 1983), plaintiff sought a declaratory judgment setting forth her rights under a lease which contained a clause requiring the landlord's written consent to a sublease, but no clause expressly requiring that consent not be withheld unreasonably. The landlord refused consent for a variety of specious reasons, such as that the tenant had not filled in completely every space on the application for permission to sublet. The court held for the tenant against the landlord's "unreasonable" position.

In *Fernandez v. Vazquez*, supra, the owner of certain business property entered into a five-year lease with appellant Fernandez and Hialeah Bakery. The lease contained a provision forbidding subletting or assigning the premises without the lessor's written consent. About

fifteen months after executing the lease, appellant arranged to sell the bakery business to a third party, one Gonzalez; some ten days later the original owners of the real property sold it to Vazquez. The new owner refused consent to assignment of the lease, and then less than a month later offered Gonzalez a new lease at a rental of $250 per month more than Fernandez and Hialeah had been paying. The trial court noted, at 1173-1174, that it is generally recognized that "a lease is a contract and, as such, should be governed by the general contract principles of good faith and commercial reasonableness. One established contract principle is that a party's good faith cooperation is an implied condition precedent to performance of a contract. Where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing herself of her own wrongdoing [Cits.] Where a lessee . . . has agreed to limit [the] right [to sublet] by first acquiring the consent of the landlord, we believe the lessee has a right to expect that consent will not be unreasonably withheld." The court went on to hold, at 1174: "A withholding of consent . . . , which fails the tests for good faith and commercial reasonableness, constitutes a breach of the lease agreement." See Restatement (2d) of Property, Landlord & Tenant, § 15.2 (2); 21 ALR4th 191, 300 et seq. and cases annotated therein.

Of the decisions cited, supra, the determination as to reasonableness *vel non* was made in some instances by a jury, and in others by the court, as on motions for summary judgment or for declaratory judgment. Thus, although as we have noted, supra, the question of reasonableness or unreasonableness is most often a jury issue, in plain and palpable cases the determination may be made by the court. Moreover, it is well settled that where a lease contract contains disputed provisions, it will ordinarily be construed against the draftsman — who in most instances, as in the case *sub judice*, is the lessor.

In contrast to the majority of the cases cited, supra, the lease contract in the instant case contains a clause expressly prohibiting unreasonably withholding consent to a sublease. The shopping center manager's letter to appellant's attorney states: "It has been a long-standing policy of Lenox Square not to permit subletting the premises. Any new lease entered into on the Stern's premises would have to be made with the landlord under ordinary circumstances." We regard this letter as *prima facie* evidence of conduct which, in the circumstances of the case, must be denominated arbitrary; that is, unreasoned and unreasoning, and therefore "unreasonable."

The fact that a lease states that no assignment or subletting can take place without the lessor's consent clearly implies the reciprocal; namely, "that assignment [is] possible and that such prior consent [will] not be withheld under any and all circumstances, reasonable or unreasonable." 21 ALR4th p. 203. This being so, CPI, as successor to

the original lessor, is bound by the covenant, expressly stated in the Special Stipulations to the lease, not to withhold consent unreasonably; in the same manner, Stern was bound by the express provisions of Article XIII not to sublet the premises without first obtaining CPI's consent. It is undisputed that Stern honored the latter covenant; that CPI honored its reciprocal obligation is not so clear.

It is true that, as CPI argues, Stern never presented to CPI a formal written proposal for subletting to a specific tenant on specific terms. It is also true that Stern never reached a specific agreement with either Bounds or his other prospective subtenant as to the terms of any proposed sublease. The record includes testimony, however, that when Stern inquired orally of the manager regarding the possibility of subletting his premises, the manager gave him no direct answer, and that upon a second oral inquiry, he categorically refused. The manager's letter to appellant's counsel, supra, was equally categorical in its refusal to consent to a sublease. Moreover, the manager testified at trial that he had never seen a set of circumstances under which CPI would have felt it appropriate to depart from its stated policy. CPI contends, however, that the manager never had any occasion officially either to grant or to deny consent to any proposed sublease, and that Stern's contention that consent was "unreasonably withheld" is therefore without foundation.

Stern alleges (and there was corroborating testimony) that some preliminary discussion was held as to what the terms of a proposed sublease might embrace, but that he did not go so far as to draw up a formal proposal because, after receiving the manager's rebuffs, he believed the effort would be futile. Stern thus alleges that the manager's actions frustrated his efforts and produced a chilling effect which deterred him from going through the motions of preparing a formal proposal for a transaction on which the manager's conversation and letter had seemingly already closed the door — and that, being in dire financial straits at that point, he gave up and made plans to vacate the premises.

OCGA § 9-11-50 (a) sets forth the following criteria for the granting of a directed verdict: "If there is no conflict in the evidence . . . and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." On the issue of reasonableness no evidence was adduced as to any valid reason for withholding consent to sublease, nor was there any contention that CPI, as successor and assignee of Lenox Square, Inc., was not bound by the express terms of the existing lease. We hold, therefore, that appellant was entitled to a directed verdict on this issue, and that the trial court erred in denying his motion.

In so holding, we are mindful that " '[i]t is our duty to construe the evidence to uphold the verdict instead of upsetting it.' " *Bailey v.*

*Todd*, 126 Ga. App. 731, 732 (191 SE2d 547) (1972). Nevertheless, we are persuaded that in the case at bar the issue was clearly one of law rather than of fact, and therefore properly for the court to decide; and, moreover, that as a matter of law a verdict for appellant was clearly required. The trial court should have granted appellant's motion and heard evidence as to damages flowing from appellee's breach of this provision of the lease. The case must be remanded for proceedings not inconsistent with the above.

*Judgment affirmed in part and reversed in part. Pope and Beasley, JJ., concur.*

DECIDED OCTOBER 8, 1985 —
REHEARING DENIED OCTOBER 29, 1985 — ▉▉▉▉▉▉▉

*Hugh W. Gibert, James W. McKenzie*, for appellant.
*Malcolm P. Smith*, for appellee.