**SHARED MEDICAL RESOURCES, INC., Plaintiff,**

**v.**

**AMERICUS AND SUMTER COUNTY HOSPITAL AUTHORITY, d/b/a Americus and Sumter County Hospital, Defendant.**

**Civ. A. No. 85–195–ALB–AMER.**

United States District Court, M.D. Georgia, Albany-Americus Division.

Oct. 30, 1987.

Jerome M. Rothschild, Young, Layfield & Rothschild, Columbus, Ga., for plaintiff.

Randolph B. Jones, Jr., Smith, Jones & Jones, Americus, Ga., James V. Towson, Jones, Cork & Miller, Macon, Ga., for defendant.

---

**3.** Because of the grounds for dismissal, the Court need not reach the other arguments raised by the parties.

FITZPATRICK, District Judge.

Summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Against this recently enunciated standard, the court must measure the Parties' Cross-Motions for Summary Judgment. This case is a good example of the adage that the term "legal brief" is an oxymoron. While the case simply involves a contract clause of 32 words and two decisions of the Georgia appellate courts, it developed into a record measuring 10 inches in thickness and weighing 21 pounds. Although the court asked for a brief of authority from both sides, what was forthcoming reminds one of the drunk on the Titanic who said, "I ordered ice, but this is ridiculous." Perhaps counsel for both sides, although very competent and extremely diligent, are somewhat confused as to what is meant by "weight of the evidence." Nevertheless, the court finds that the undisputed facts warrant the granting of Plaintiff's motion on the issue of contract breach. The court's findings of fact and conclusions of law are set forth below.

## I. FACTS

Shared Medical Resources, Inc. (Shared Medical) is a Florida corporation which provides mobile imaging services to various hospitals in the Southeastern United States. On or about January 25, 1982, Shared Medical began providing nuclear medicine and ultrasound services to Defendant Americus and Sumter County Hospital. On October 19, 1982, Defendant Hospital entered into a second exclusive contract with Shared Medical for mobile computerized tomographic (CT) scanning services (CT Agreement). The CT Agreement was executed by J.R. Griffith, Administrator and Chief Executive of Defendant Hospital, and David Davidson, then President of Plaintiff Shared Medical. Defendant's Board of Directors approved the CT Agreement. At the time of contracting, Dr. F. Ellen McDaniel was the Chief of Radiology at Defendant Hospital and was persuasive in the decision to contract with Shared Medical for the mobile services. Dr. McDaniel's position throughout all times relevant to this action was that of an independent contractor maintaining a private practice outside of the hospital. She had no authority whatsoever to bind Defendant Hospital.

Under Georgia law the CT Agreement could not become effective until a Certificate of Need was issued to Defendant Hospital by the Georgia State Health Planning and Development Agency. *See* O.C.G.A. § 31–6–40. Several months after the execution of the CT scanning contract, a Certificate of Need was granted. Thereafter, on April 9, 1983, Shared Medical commenced mobile CT services at Defendant Hospital.

According to Article 7.5 of the CT Agreement, exclusive services were to be provided for three years from the commencement of actual performance, i.e. until April 9, 1986. In order to terminate the contract prior to its contractual termination date, the CT Agreement provided, at Article 6.1(c):

Either party may terminate this agreement if: ...

(c) the other party shall default in the performance of a material covenant or provision of this Agreement and said default continues for a period of 30 days after written notice to the defaulting party.

The contract also explicitly recognized the mobile nature of Shared Medical's services. The term mobile signified that the CT unit serving Defendant Hospital was additionally to provide similar services to other area hospitals not parties to the CT Agreement. The services schedule was attached to the CT Agreement as Schedule B and referred to in Articles 1.3 and 4.1. Defendant Hospital was to receive services weekly on Tuesday and Thursday afternoons and Saturday mornings.

Shared Medical began servicing both Defendant Hospital and Colquit Hospital in Moultrie, Georgia simultaneously, adding the Bainbridge, Georgia hospital shortly thereafter as a non-contract "fill-in" user. Initially, Defendant had no complaints with the services being rendered by Shared Medical, and in fact had much praise for the work of Shared Medical's technician, Mike O'Lear. On June 28, 1983, services were switched on Tuesdays and Thursdays from afternoon to morning at Defendant's request. The hospitals in Moultrie and Bainbridge were sharing Mondays, Wednesdays and Fridays; thus, the afternoon to morning switch for Defendant was easily accomplished.

In early November, 1983, services at the Bainbridge Memorial Hospital were switched to Tuesday and Thursday afternoons and Plaintiff Shared Medical planned to begin servicing Lakeshore Hospital in Lake City, Florida on Mondays, Wednesdays, and Fridays on a short-term basis. About this same time, Defendant began expressing concern for the quality of services it would receive after the Bainbridge switch. On November 10, 1983, Dr. McDaniel wrote to Shared Medical's then President, Patrick Dines, requesting written confirmation of certain oral assurances allegedly made by Mr. Dines on November 8. Chief among these assurances was that "the scanner and CT personnel will not leave the Americus and Sumter County Hospital until all patient examinations are complete...." The stated impetus for this request was the addition of the Lakeshore Hospital.

Shared Medical responded to Dr. McDaniel's letter on November 22. Al Buesse, then Vice-President of Operations, addressed each of Dr. McDaniel's requests. Mr. Beusse specifically assured Dr. McDaniel that "[t]he Mobile CT will not leave Americus and Sumter County Hospital until all scheduled patients are scanned, except as agreed upon." This letter was not only confirmation of Dr. McDaniel's letter of November 10 and the preceding telephone conversation, but also a conversation which took place on November 15. During this time period, contact also was initiated between Defendant Hospital and National Imaging, Inc. (National Imaging), one of Plaintiff's competitors. According to Mr. Griffith, then Defendant's Administrator, this contact was at his request.

During the month of December, Plaintiff negotiated with the Jacksonville, Florida, Naval Air Station Hospital to provide CT scanning services. When the contract was worked out, the Jacksonville hospital was to receive services on Mondays, Wednesdays, and Fridays beginning February 1, 1984. To accommodate this addition, the hospital in Moultrie agreed to switch to the afternoon shift on Tuesdays and Thursdays after Defendant's morning sessions.

In January 1984, National Imaging, Shared Medical's rival, began providing CT scanning services to a hospital in Hawkinsville, Georgia. Continuing services in Hawkinsville, however, were contingent upon National Imaging forming a mobile scanning network based at Defendant Hospital. National Imaging was also in the process of negotiating with Mike O'Lear, Shared Medical's CT technician who eventually did become an employee of National Imaging. On January 19, 1984, Defendant's Administrator, Mr. Griffith, met with Tom Owings, National Imaging's President, regarding specific contractual provisions and changes in National Imaging's standard CT contract. The mark-up of the proposed contract between National Imaging and Defendant Hospital specified February 2, 1984 as delivery date for the mobile unit. National Imaging actually began servicing Defendant on February 4, 1984 after being notified on February 2, the last day Shared Medical provided services. This prompt and smooth transition was possible because certain necessary electrical accommodations had been made in advance of the switch.

Meanwhile, during the month of January 1984, Shared Medical was making preparations for the addition of the hospital in Jacksonville to the CT scanning schedule. Mr. Dines anticipated conflict from Defendant Hospital as the new schedule would require stricter adherence to the scanning schedule than had been exhibited in the

past. In an attempt to avoid friction, Dines suggested the Defendant either take steps to scan patients in a more timely fashion or shift back to the original afternoon time slots on Tuesdays and Thursdays. In his letter of January 30, Mr. Dines outlined these suggestions and the constraints of the new schedule.

On February 1, Dr. McDaniel wrote a memorandum to Mr. Griffith suggesting that if Shared Medical was going to insist upon prompt departure at the end of the scheduled 4½ hour morning shifts on Tuesdays, Thursdays and Saturdays, then Defendant should immediately terminate the CT Agreement. Dr. McDaniel's reaction was motivated by her belief that strict adherence to the new schedule would impair her ability to treat the patients and would constitute an "abrogation of good faith by [Shared Medical]."

On Thursday, February 2, Defendant scheduled eight or nine patients for approximately 10 scans. While this many patients had in the past been scheduled for a single day, the number was well above the average number of patients and scans done on a given day. Early that morning Carlos Quintero, Plaintiff's Chief technician, recognized that more scans were scheduled than could be completed in the 4½ hour shift. He communicated this to Dines and Stan Hodges, Defendant's Radiology Administrator. Shared Medical's scanning team completed five patients and seven scans that day before leaving at approximately 12:00 noon. Two or three scheduled non-emergency patients were left unscanned. On the same day, February 2, Defendant notified National Imaging that it could begin providing services on February 4.

The following day, February 3, Griffith notified Dines by telephone that Shared Medical's services were to terminate immediately. This telephone conversation was followed up with a formal notice of termination sent by certified mail. The notice letter specified eight areas in which Shared Medical had breached the CT Agreement and confirmed that Defendant intended the termination to be effective immediately,

February 3, 1984. Defendant claims that on no less than thirteen occasions between November 1983 and February 1984 Plaintiff left Defendant Hospital before completion of all scheduled scans.

Dines responded to the termination letter on February 7, pointing out that Defendant's immediate unilateral termination was in breach of Article 6.1(c) of the CT Agreement. Dines' response also advised Defendant that Shared Medical stood ready to cure and continue performance under the CT Agreement.

Plaintiff initiated this action on August 19, 1985. Plaintiff's and Defendant's Cross-Motions for Summary Judgment are presently before the court and the broad issue is whether either party has failed to establish an essential element of its case as required under the *Celotex Corp.* decision.

## II. CONCLUSIONS OF LAW

■ The initial question for the court's decision is whether or not Defendant was required to strictly adhere to the CT Agreement's termination clause. Only after this issue is disposed of might subsequent issues be implicated. Having waded through the seemingly infinite pages of legal argument submitted by either party, the court finds that resolution of this issue hinges on the applicability to the instant action of two Georgia cases: either *Johnson v. Kahrs,* 199 Ga. 365, 34 S.E.2d 503 (1945); or *Mayor & City of Douglasville v. Hildebrand,* 175 Ga.App. 434, 333 S.E.2d 674 (1985).

In *Johnson v. Kahrs,* the owners of a pharmacy contracted for the services of a manager to be paid on a monthly basis until the net profits of the business reached $5000 at which time the manager would become a partner in the business. The contract contained a thirty days' notice of termination-for-cause provision. Because of alleged mismanagement, the owners notified the store manager in writing of the immediate dissolution of the agreement and sent an accompanying check for the one month salary which he would have received during the thirty day notice period. The Supreme Court of Georgia held that this notice was inadequate. Termi-

nation of the contract without the required 30 days' notice would cause a forfeiture of a right due the manager under the contract, i.e., his right to convince the owners that his conduct was not detrimental to the business. This right, recognized by the Georgia court, is closely analogous to the right to cure involved in the case at bar.

Where a forfeiture is dependent upon the giving of a certain written notice, if it be such as can be enforced, it must appear that the notice was given in compliance with the contract, both as to time and contents, and that the default occurred.

*Johnson,* 199 Ga. at 367–68, 34 S.E.2d at 504. (quoting *Georgia Railroad & Banking Co. v. Haas,* 127 Ga. 187, 190, 56 S.E. 313, 314 (1906)); *see also Hubert v. Luden's Inc.,* 92 Ga. App. 427, 88 S.E.2d 481 (1955).

Defendant argues that *Mayor & City of Douglasville v. Hildebrand* stands for the proposition that a substantial and fundamental breach which defeats the object of a contract authorizes immediate rescission by the non-breaching party notwithstanding the existence of a notice termination clause. The outcome of *Hildebrand,* however, is closely tailored to the specific facts of the case. Hildebrand entered into a three year employment contract which contained a 90 day termination-at-will ("no cause") clause. The city attempted immediate termination of the contract for material breaches of the contract by Hildebrand. The Georgia Court of Appeals found that the existence of a fundamental contract breach would take the *Hildebrand* situation outside of the termination-at-will clause and allow immediate rescission. The court assumed that the 90 day "no just cause" termination provision was ineffective in the face of a material contract breach. The true issue in *Hildebrand* was whether or not the city had borne its burden of showing a material breach which, in fact, it had not done and thus was required to give the contractually mandated 90 day notice.

The court finds that *Johnson* is the controlling case in this situation and that *Hildebrand* is distinguishable for several reasons. Under *Johnson,* in order for a court to require strict compliance with the contractual notice provision, there must be a right due the other party which would necessarily be forfeited by short-termination. Shared Medical had the right to cure any breach of a material covenant or provision during the 30 day notice period. This right to cure is closely analogous to the right protected in *Johnson* and must be afforded the same defense by this court. The provisional language of Article 6.1(c) of the CT Agreement is clear and unambiguous. Thirty days' written notice was to be given to an allegedly breaching party prior to termination in order to afford the party the opportunity to cure. No other reasonable construction of the clause is necessary or even permissible. Under Georgia law, clear and unambiguous language in a contract must be enforced and ambiguity is always a question of law for the court. *Stern's Gallery of Gifts, Inc. v. Corporate Property Investors,* 176 Ga. App. 586, 337 S.E.2d 29, 35 (1985). The language in the CT Agreement is unambiguous and proper subject matter for summary judgment.

Several factors take Shared Medical's situation outside the holding of *Hildebrand.* Foremost is the clause in question and its language. The *Hildebrand* provision was a "no cause" termination clause, whereas Article 6.1(c) is a "for cause" provision. A substantial breach took the parties in *Hildebrand* outside of the termination clause. The CT Agreement at issue here specifically contemplated material breaches. *Hildebrand* also dealt with an employer-employee relationship. The alliance between Shared Medical and Defendant Hospital was for the provision of professional services between parties of relatively equal bargaining power pursuant to a negotiated contract. If one party held greater negotiating power, it would have been Defendant Hospital as the party seeking services being offered by various companies. The court in *Hildebrand* never truly addressed the issue now before this court because it assumed that the "no just cause" provision was inapplicable where there was a material breach. The language of the clause was

still controlling in that situation, however, as it must be here. *Hildebrand* falls outside the parameters of the issue at hand.

Defendant has set forth numerous arguments in order to sustain its burden of proof or at least to lay out questions of fact sufficient to create issues for a jury's decision. The court finds that several of the points propounded by Defendant need addressing. First, Defendant claims that even if the termination clause is controlling, the breach involved in this action is noncureable. This contract was negotiated and the parties must be bound by its language. The termination clause specifically speaks to material breaches. Defendant was well aware of the nature of the services involved and could easily have provided differently in the contract. The court finds that with proper notice, the alleged breach involved could have been cured by compliance with the CT Agreement in its modified state during the 30 days following notice. This finding also addresses Defendant's hypothetical to the effect that under the ruling of this court, Plaintiff could fail to provide services for twenty-nine days and still cure the breach by resuming services on the thirtieth day. The type of abusive conduct suggested by Defendant's extreme hypothetical would be looked upon with disfavor by any court. Cure could only be accomplished by consistent adherence to the agreement over the entire length of the cure period.

■ Defendant's next arguments stem from Dr. McDaniel's November 10 letter to Patrick Dines. Defendant first argues that under O.C.G.A. § 13–4–4,[1] a quasi-new contract was formed in November 1983 as a result of the letters exchanged between Dr. McDaniel, Mr. Dines, and Defendant Hospital's Administration. Assuming *arguendo,* however, that such a quasi-new contract

was formed, "it is only the particular terms encompassed in the quasi new agreement that are affected thereby, and the other terms of the original contract remain enforceable as written." *Shalom Farms v. Columbus Bank & Trust Co.,* 169 Ga.App. 145, 312 S.E.2d 138, 140 (1983). The record here is devoid of any indication that the parties to the CT Agreement ever mutually consented to a modification of the termination provisions of the contract. Thus, Article 6.1(c) survived any quasi-new agreement which may have been created. While the existence or non-existence of a quasi-new agreement is a question for the jury's determination, *Eaves v. J.C. Bradford & Co.,* 173 Ga.App. 470, 474, 326 S.E.2d 830, 832 (1985), the interpretation of clear and unambiguous language of unaffected provisions of the original agreement is for the court's judgment as a matter of law.

■ Defendant next argues that Dr. McDaniels' letter constituted substantial compliance with the CT Agreement's notice provision under O.C.G.A. § 13–4–20.[2] This court has already found that more than substantial compliance is necessary under *Johnson v. Kahrs.* Dr. McDaniels' letter gave no notice of past breaches, it only requested written assurance of future performance. At no point in the letter was there mentioned either past breaches or even the threat of termination. Moreover, Dr. McDaniel had no authority to either bind the hospital or sever any contractual relationship. Also, the relationship between the parties continued well past the 30 day termination period. While the question of whether notice has been given is one for the jury, construction or sufficiency of the notice is a matter of law for the court's decision. *Great Central Insurance Co. v. Bowery Savings Bank,* 142

---

1. O.C.G.A. § 13–4–4 provides:
   Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement. The contract will be suspended by the departure until such notice.

2. O.C.G.A. § 13–4–20 provides:
   Performance, to be effectual, must be accomplished by the party bound to perform, or by his agent where personal skill is not required, or by someone substituted, by consent, in his place, and must be substantially in compliance with the spirit and the letter of the contract and completed within a reasonable time.

Ga.App. 630, 236 S.E.2d 772, 773 (1977). The type of notice attempted by Dr. McDaniel was insufficient under these circumstances. Even if Dr. McDaniels' letter was sufficient notice, however, acceptance of service after a reasonable time past the termination period constituted a waiver. A termination notice cannot be viable *ad infinitum*. This argument fails as do the remainder of the arguments considered by the court in Defendant's brief in opposition. Defendant Hospital has failed to sustain its burden of establishing that strict adherence to the termination clause of the CT Agreement was not required. Thus, summary judgment in favor of Shared Medical is appropriate. *Celotex Corp.*, 106 S.Ct. 2552–53.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff Shared Medical's Motion for Summary Judgment and DENIES Defendant Americus and Sumter County Hospital's Cross-Motion for Summary Judgment. The issue of damages is still pending before the court and must be decided by a jury.