QUINTEL COMMUNICATIONS, INC. Plaintiff,

v.

FEDERAL TRANSTEL, INC., Defendant.

No. 00 CIV. 3803(CM).

United States District Court, S.D. New York.

May 14, 2001.

Jay D. Lukowski, Feder, Kasovitz, Isaacson, Weber, Skala & Bass, L.L.P., New York City, for Plaintiff.

D. Keith Andress, Patricia Clotfelter, Alum Griffiths, Walter A. Saurack, Satterlee Stephens Burke & Burke, New York City, for Defendant.

## DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND SETTING INQUEST

McMAHON, District Judge.

Plaintiff Quintel Communications, Inc. (now known as Traffix, Inc.) markets various types of astrology/psychic entertainment related services. Among its products was the "call a psychic" telephone service advertised on cable television and radio. That is to say, Quintel provided had psychics stationed at one end of a "900" telephone line, and persons would call those psychics to consult about their problems. Of course, calls made to "900" telephone lines, unlike calls made to "800"

telephone lines, do not come for nothing. Quintel expected to be paid for providing all those psychic consultations.

But Quintel was in the astrology/psychic business, not in the telephone billing business. It did not have the wherewithal to attend to the more commercial aspects of its business. For that, it retained the services of defendant Federal Transtel, Inc. ("FTT"). FTT is in the business of billing persons who avail themselves of "900" telephone services, collecting what is due, and remitting that sum—less a handsome fee—to providers of those services, like Quintel.

In 1996, Quintel and FTT entered into a contract (drafted by FTT) that governed their business arrangement. Quintel elected not to renew that contract when it expired in 1999. Then, when their relationship was about to end, FTT withheld more than $1 million it had received in respect of Quintel's "Dial a Psychic" program. FTT took the position that the withholding was justified under the terms of the contract. Quintel disagreed, and brought this lawsuit to recover the money it claims it is rightfully owed.

Both parties agree that the contract governs and that my interpretation of the contract will dispose of the matter. Both parties also insist that the contract is unambiguous. I agree with them that the contract is unambiguous—and it does not take a psychic to divine its meaning. The contract does not authorize FTT to withhold the money it has thus far refused to pay Quintel. For that reason, I grant plaintiff's motion for summary judgment, deny defendant's cross-motion, and direct that Magistrate Judge George A. Yanthis hold an inquest if the parties cannot agree

on the amount of interest due on the improperly withheld sum, which is $845,334.19.

*Statement of Undisputed Facts*

There is no dispute about the facts in this case.

Quintel provided entertainment services to the public. Among the services it provided were a psychic "hot-line" and a telephone "psychic club." Quintel did not bill the persons who used its services directly. Rather, it retained billing companies, such as FTT, to collect the money due from users.

To simplify FTT's role: it provided information on usage of Quintel's psychic services to each caller's local telephone company (known as the local exchange company, or LEC). The LEC then included Quintel's fee in the customer's monthly telephone bill. The LEC remitted the sum collected in right of Quintel's services to FTT, which in turn remitted those sums (less an administrative fee) to Quintel.

■ In December 1996, Quintel and FTT signed the contract—drafted by FTT, and thus construed against it [1]—that governed their relationship. This "Billing and Services Agreement" provided that FTT would provide its "Client" (a term defined in the contract to mean Quintel) with four separately-described billing and collection services—"Bill Processing," "Caller Billing," "Inquiry Handling and Caller Adjustments" and "Remittance"—for a period of two years. These services were to be in right of "transactions initiated by customers of Client." The term "Subscribers" is also a defined term in the contract, and refers to "customers of Client."

---

1. Generally, contracts should be construed against the drafter. *See Stern's Gallery of Gifts v. Corporate Property Investors,* 176 Ga. App. 586, 593(4), 337 S.E.2d 29 (1985);

*Smith v. Persichetti,* 245 Ga.App. 357, 537 S.E.2d 441 (2000) (noting that ambiguous contract language must be construed against the drafter).

*Bill Processing:* Under the terms of the contract, Client (Quintel) was to deliver "applicable details" about "transactions initiated by customers of Client (Subscribers)" to FTT on magnetic tape—that is, Quintel would give FTT, in machine readable form, information about who had called its psychic hotline service when and for how long. This information is defined in the contract as "Transaction Details." Quintel warranted that it was the "Owner of Record" of the Transaction Details and that it had the right to collect for all Transaction Details delivered to FTT. Thus, the contract clearly contemplates that the terms "Transaction" and "Transaction Details" refer solely and exclusively to a Subscriber's use of Quintel's telephone products and services.

*Subscriber Billing:* FTT agreed to arrange with the Subscriber's (Quintel's client's) LEC to have "the applicable charge for each Subscriber's Transaction Detail" placed on the Subscriber's telephone bill. These are defined as "Billable Transactions." Because of the use of the defined terms, such as Subscribed and Transaction Detail, it is beyond cavil that the term "Billable Transactions" refers only to transactions between Quintel and its clients.

The parties contemplated that FTT might have difficulty working with particular LECs, so as to endanger FTT's ability to meet its contractual obligations. To deal with that, the contract gave FTT discretion to take such remedial action as it deemed appropriate—including but not limited to (i) discontinuing Billing and Collection Services on a Program-specific basis; (ii) imposing restrictions on call originations so as to limit Transaction Details to transactions originating in an area where FTT could obtain the cooperation of the LECs; or even (iii) terminating the Billing and Collections Agreement. These

drastic actions were permissible only if FTT determined that it could not perform because of recalcitrant or uncooperative LECs, and for no other reason. The contract also made it clear that FTT had no obligation to contest any adjustment made for whatever reason by an LEC to a Subscriber's (i.e., a Quintel customer's) telephone bill.

*Inquiry Handling and Caller Adjustments:* FTT agreed to handle complaints and inquiries from Quintel's Subscribers about their Billable Transactions (i.e., their dealings with Quintel). Quintel authorized FTT to adjust a Subscriber's Billable Transactions as appropriate, and agreed that it would not try to collect from Subscribers any amounts that either FTT or an LEC removed from their Billable Transactions, unless FTT signed off on the collection effort.

*Remittance:* The rest of the non-boilerplate in the contract deals with FTT's obligation to pay Quintel. It, like earlier sections of the contract, contains a number of defined terms—which are, in my opinion, the key to interpreting this particular agreement.

"Program Revenue" is defined as the "gross amount of all revenue generated by Billing [sic] Transactions" (it appears that this should read "Billable Transactions," as that is the term used elsewhere in the document) for the Program. The term "Program," while capitalized, is not defined in the agreement. But it necessarily refers to Quintel's services, since "Billable Transactions" are expressly limited to transactions between Quintel and its clients (Subscribers) that are actually provided to the LECs for billing to Subscribers. Since Program Revenues are defined in terms of amounts billed, rather than amounts collected, it would be more accurate to say that they are the anticipated revenues, or the amounts that would be

generated if everyone who consulted Quintel's psychics paid his or her telephone bill.

"Revenue Adjustments" is defined as "all edits, charges, deductions, credits and setoff against or related to the Program." The term includes such things as late charges, penalties and interest; billing and collection charges (as set forth in Appendix A to the contract); and taxes or related charges. It also includes two items that require further definition: "Unbillable Transactions and Post Billing Adjustments" and "Adjustments to the PBA Reserve."

"Post Billing Adjustments" are defined simply as "adjustments to a Subscriber's account." "Unbillable Transactions" are charges that FTT has processed and sent to the LEC, but that the LEC, for one reason or another, has rejected and declined to bill to Quintel's Subscriber. They are, in short, one possible type of Post Billing Adjustment. FTT agreed to provide Quintel with "its available PBA detail on such adjustments"—that is, with whatever information it had regarding those adjustments. FTT could not, however, claim that it had no information whatever about adjustments, since "PBA detail shall consist of, as a minimum, the telephone number of the Subscriber's account to which adjustments have been made by FTT or by the LECs. Telephone numbers contained in such PBA detail shall be Subscriber's billed by FTT on behalf of Client." Again, the use of various defined terms, such as "Subscriber" and "Client" in defining the terms "Post Billing Adjustment" and "PBA detail" make it clear that PBAs under this contract were limited to adjustments that related to the customer's use of Quintel's products and services.

The parties anticipated that from time to time such post-billing adjustments would be made. Accordingly, they provided for a reserve to be set up, known as the "PBA Reserve." That term is defined as an amount equal to Program Revenues (anticipated revenues from all FTT billings on behalf of Quintel) multiplied by the Uncollectible Factor (yet another defined term, defined as "the percentage of Program Revenues which FTT is not likely to collect, and set by FTT from time to time based on its experience rating"). Because PBA Reserve is defined in terms of the PBA and Program Revenue—which, in the context of the contract, refer only to Quintel's products and services and revenues generated therefrom—the PBA Reserve is set up to fund, and exists solely to fund, billing adjustments that relate to Quintel programs covered by the contract.

"Client Payment" is defined as Program Revenue less Revenue Adjustments. FTT was required to transmit the Client Payment to the Client (Quintel) after a fixed period of time and after taking the Revenue Adjustments. Program Revenues received by FTT were to be disbursed in the following order: *first*, to pay taxes "respecting Transactions for the Products Offering;" *second*, to pay FTT its fee (the schedule of which is set forth in Appendix A); *third*, to maintain the PBA Reserve at the level calculated by multiplying Program Revenues times the Uncollectible Factor; *fourth*, to replenish the security deposit if necessary; and *fifth*, to pay FTT's contract activation fee. The Client Payment is whatever is left over after those adjustments. Since no other deduction or offset is specified in the contract, Quintel was to receive that amount in its entirety.

Thus, the only monies FTT was to retain after paying taxes and itself was the PBA Reserve. And the contract provided for the disposition of those funds after a fixed period of time:

> The PBA Reserve balance will remain under FTT's control until FTT has pro-

cessed all final charge-backs, deductions or other uncollectible adjustments from the LEC's, but for no longer than twelve (12) complete calendar months from month [sic] in which the Transaction Details were processed by FTT. In the event of the termination of this Agreement, the remaining balance in the PBA Reserve and the full security deposit shall be distributed to the Client no later than twelve (12) months after the date of termination of the Agreement.

(Stollman Aff. at Ex. C.)

There were a variety of circumstances under which FTT could terminate the Agreement. By its terms, the Agreement ended on November 11, 1998. It was extended by letter agreement to May 28, 1999. It was not thereafter extended. Per the terms of the Agreement, all amounts due and owing to Quintel, plus the PBA Reserve and the full amount of the security deposit, should have been in Quintel's hands no later than May 28, 2000.

Consistent with the provisions of the agreement, during the two and one half years that FTT was under contract to Quintel, it made post billing adjustments only when those adjustments related to a specific caller's use of Quintel's services. Almost every month, for thirty one months, FTT submitted information to Quintel about post-billing adjustments; this information included the telephone number of the Subscriber and identified the corresponding Quintel billing at issue. FTT does not dispute Quintel's evidence in this regard.

Although the original term of the agreement was extended for six months, Quintel ultimately decided not to renew it. On May 28, 1999—the day the agreement expired—FTT advised Quintel that it would be taking a one-time, bulk post-billing adjustment. To be specific, FTT wrote that it would charge Quintel for "a pro rata share of non-detailed monthly adjustments." (Letter of Karl Hendrickson dated May 28, 1999). FTT subsequently withheld $845,334.15 from amounts otherwise due Quintel. It has refused to provide any information that would allow Quintel to establish that this "pro rata post billing adjustment" relates to Quintel Subscribers and their use of Quintel's products and services. It has not even provided the telephone numbers of persons to whom the adjustment relates—information that "at a minimum" must be included in PBA detail.

This action was filed on April 14, 2000.

*Conclusions of Law*

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir. 1987).

■ This case is particularly appropriate for summary judgment because, "[t]he construction and interpretation of a contract, being a matter of law for the court, may properly be disposed of by summary judgment." *Stern's Gallery of Gifts, Inc. v. Corporate Property Investors, Inc.,* 176 Ga.App. 586, 337 S.E.2d 29, 36 (1985).[2]

2. Georgia law is cited, as the contract is governed by Georgia law.

■ The parties agree about one thing: the contract is unambiguous. Of course, they disagree about what the contract unambiguously says. Their disagreement does not mean that the contract is ambiguous, or gives rise to any issue of fact. The Court's job is to look to the language of the document and to give the words used their ordinary meaning. *Original Appalachian Artworks, Inc. v. S. Diamond Associates, Inc.*, 44 F.3d 925, 930 (11th Cir.1995); *Race, Inc. v. Wade Leasing, Inc.*, 201 Ga.App. 340, 411 S.E.2d 56, 57 (Ga.App.1991). When one party's construction of contract language is patently untenable or unreasonable, the Court is free to disregard it and to give the words "an interpretation of ordinary significance." *Original Appalachian Artworks,* 44 F.3d at 930; *see also In re Club Associates,* 951 F.2d 1223, 1230 (11th Cir.1992).

I agree with the parties that the contract language is unambiguous. Although the parties have submitted a considerable amount of parol evidence, it is all quite irrelevant to the task at hand. All of the key contractual terms, the ones that require interpretation, are *defined terms*— that is, the parties set forth exactly what they meant in the body of the contract itself. This makes the job of construction particularly easy.

■ The critical language is found on page 2 of the contract. There, "Client Payment" (i.e., the amount available to be paid to Quintel) is defined as "Program Revenue less Revenue Adjustments." The only permissible Revenue Adjustments are those specified at page 2 of the Agreement—(i) penalties, late charges and interest; (ii) FTT's billing and collection charges as set forth in Appendix A; (iii) adjustments and True–Ups to the PBA Reserve; (iv) taxes and related charges; and (v) Unbillable Transactions and Post Billing Adjustments. FTT's one-time "pro rata post billing adjustment" purports on its face to be a post billing adjustment under item (v), and does not fall within the ambit of any other item. In particular, it could not be an adjustment to the PBA Reserve, because the entire PBA Reserve had to be remitted to Quintel within a year following the termination of the contract, and FTT has admittedly kept the money.

Post Billing Adjustment is also a defined term in this contract, and it refers exclusively and unequivocally to an adjustment attributable to a Quintel Subscriber's bill for some matter relating to his use or non-use of Quintel's products and services. In order to make a Post Billing Adjustment, FTT is contractually required to provide Quintel with backup (PBA detail) which must at least include the telephone number of the Quintel Subscriber whose bill was adjusted by FTT or an LEC. The contract goes on to state, "Telephone numbers contained in such PBA detail shall be Subscriber's billed by FTT on behalf of Client." As noted above, Client and Subscriber are defined terms, referring to Quintel and its customers, respectively.

The only plausible—the only possible—interpretation of this language is that FTT is entitled to make post-billing adjustments when it or the LEC adjusts the account of a Quintel customer for reasons related to Quintel's program. There is nothing in this contract that authorizes FTT to make "pro rata billing adjustments" based on "non-detailed monthly adjustments," because those adjustments could relate to people who never called Quintel's psychic hotline or joined its psychic club.

■ FTT argues that the withholding was authorized as an adjustment to the PBA Reserve. (Def. Mem. at 2). There are two answers to that. First, FTT's Chief Operating Officer described these adjustments in his letter of May 28, 1999

as billing adjustments, not adjustments to the reserve account. FTT is bound by that admission. Second, because the PBA Reserve is defined as the "Program Revenues" (which, by definition, must relate to Quintel's products and services) times the "Uncollectible Factor" (which is defined as a percentage of the Program Revenues, and thus is limited to FTT's collection experience on Quintel-related accounts), that reserve can only contain Quintel-related funds, and can only be adjusted based on FTT's inability to collect Quintel-related revenues from Quintel Subscribers. Indeed, the Agreement is even more explicit when it states that FTT may deduct funds from the PBA Reserve in order to compensate Subscribers, LECs *or FTT itself* for "actual PBAs." Moreover, FTT was obligated to refund the entire PBA Reserve to Quintel no later than last May. That it has kept the $845,334.19 fairly suggests that it was not part of the Reserve.

FTT also makes much of the fact that Quintel attempted to add language to the contract about "matching" adjustments. It is true that Quintel wanted to add language to the definition of Post Billing Adjustment so that it would be even clearer that they would "include only charges and adjustments that can be specifically applied to client's account by matching them to billable call detail." (Saurack Aff. at Ex. F) That this language did not make it into the final Agreement does not change the fact that the language actually used could not be clearer. Because PBAs are defined by using defined terms, which themselves refer only to Quintel's products and Quintel's customers, PBAs cannot include charges that FTT is unable to ascribe to Quintel's business. As the final agreement states, "Telephone numbers contained in such PBA detail *shall be Subscribers billed by FTT on behalf of Client.*" (Emphasis added) In the context of this Agreement,

Quintel's proposed language offered no more than belt and suspenders protection.

FTT relies on snippets of language gleaned from here and there in the contract, but they avail defendant nothing. That FTT has no obligation to try to overturn an adjustment made by an LEC says nothing whatever about what is must remit to Quintel or may withhold from Quintel. The "Method of Adjustment" to the PBA Reserve is left to FTT's discretion from between two contractually specified options, both of which rely on the use of Program Revenues—once again, a defined term that excludes anything but revenues associated with the use of Quintel's services by Subscribers. That the PBA Reserve balance remained under FTT's control for up to a year after FTT processed all final charge-backs, deductions or other uncollectible adjustments from the LECs does not mean that FTT is not required to turn the entire Reserve over to Quintel at that time, or negate the language that limits payouts to customers, LECs or FTT to "actual PBAs." FTT insists that these and other provisions would be rendered meaningless under "Quintel's strained interpretation of the Agreement," but it is FTT's interpretation that is strained to the breaking point.

If on May 29, 1999, FTT had been able to identify more than $845,000 in adjustments attributable to telephone numbers of "Subscribers billed by FTT on behalf of Client," it would have had every right to retain that amount. As FTT could not do that—and as FTT does not deny that its one-time, end-of-contract "pro rata billing adjustment" could well have included amounts that had nothing to do with psychics—it had no authority under the contract it had drafted to "retain" that sum. It was a breach of contract for FTT not to pay that money to Quintel, and Quintel shall have judgment for it.

■ In a breach of contract case, pre-judgment interest is calculated from the date of the breach to the date of judgment. If the parties cannot agree on what that amount is, Magistrate Judge Yanthis will have to calculate it for them.

The plaintiff's motion for summary judgment is granted; the defendant's is denied; the plaintiff is to have judgment in the amount of $845,334.19 plus statutory interest from May 29, 1999. The Clerk shall not enter judgment until the interest amount is calculated.

This constitutes the decision and order of the Court.