## A98A0793. CANTRELL v. NORTHEAST GEORGIA MEDICAL CENTER et al.
### (508 SE2d 716)

ANDREWS, Chief Judge.

Lee Cantrell, widower of Ava Melissa Cantrell, appeals from the judgment entered on the jury's verdict in favor of Dr. John Lewellen, Dr. Michael Connor, Dr. Thomas Sholes, and Gainesville OB/GYN Specialists, P.C., and the court's directed verdict in favor of Northeast Georgia Medical Center in this wrongful death and medical malpractice action premised on Mrs. Cantrell's death as a result of complications after suffering a ruptured appendix.

Viewed with all inferences in favor of the verdict, the evidence was that on Wednesday, February 23, 1994, Mrs. Cantrell, 31-year-old mother of two, began feeling ill. On Thursday, Mrs. Cantrell called Gainesville OB/GYN Specialists, P.C., the group practice which had handled her last pregnancy and regular gynecological care. Dr. Connor spoke with her and, based on her complaints of bilateral lower abdominal pain and increased frequency of and burning on urination, prescribed Macrobid, an antibiotic commonly used to treat urinary tract infections. He did not physically examine her, but prescribed over the telephone. He told her that, if she continued to experience problems, she should go to the emergency room or call back.

Because she did not improve, on Friday morning, Mr. Cantrell took her to the emergency room at Northeast Georgia Medical Center at 7:00 a.m., where she was seen by Dr. Lewellen, a board certified emergency specialist. Dr. Lewellen was not an employee of the hospital, but worked for Synergon, a company which staffs emergency rooms. There was a sign posted over the registration desk advising patients that the doctors were independent contractors. Additionally, Mr. Cantrell signed the consent for treatment form, which stated that "I understand that the physicians who will participate in my care are not hospital employees, but are independent contractors who have been granted the privilege of using hospital facilities to care for patients."

Dr. Lewellen spoke with and examined Mrs. Cantrell, including a bimanual pelvic examination. He found bilateral abdominal pain with suprapubic tenderness and ordered an ultrasound. The ultrasound revealed the presence of a cyst on her right ovary and fluid in the cul de sac, indicative of a ruptured ovarian cyst or pelvic inflammatory disease. Dr. Lewellen also spoke with Dr. Sholes, Dr. Connor's partner, by telephone, advising him of the situation. He also phoned the pharmacy to verify that she had been taking Macrobid. Although he considered appendicitis, Dr. Lewellen's working diagnosis was a ruptured cyst or pelvic inflammatory disease. Mrs. Cantrell was pre-

scribed another antibiotic that would address the ruptured cyst and pain medication and advised to either contact Dr. Sholes or return to the emergency room if her temperature or pain increased or if she became nauseous or faint.

On Monday, Mrs. Cantrell called Dr. Sholes' office, advised them her pain was worse, and was told to come into the office. There, she was examined by Mr. McGuire, a certified nurse midwife who had assisted in the delivery of her last child. He performed the rebound test on her abdomen, used to diagnose appendicitis, and found it was negative. He did find a mass on her left side and discussed the situation with Dr. Sholes, who ordered a vaginal probe ultrasound. The ultrasound was performed by Ms. Jans at Dr. Sholes' office. The vaginal probe is inserted and moved around the pelvis to examine the structures, including being pushed against the rectal wall, all of which Mrs. Cantrell tolerated well. As a result of the ultrasound, a second cyst was located on Mrs. Cantrell's left ovary and Dr. Sholes decided to hospitalize her for observation.

Dr. Connor was on call at the hospital Monday evening, performing surgery and delivering babies. He spoke to McGuire and Dr. Sholes and was advised of Mrs. Cantrell's condition and their suspicion of a ruptured ovarian cyst. The plan was that, if she did not improve, Dr. Sholes would perform a laparoscopic exam on Tuesday. Dr. Connor went by to see her that evening and performed an abdominal exam, finding no rebound tenderness or significant guarding, both of which are cardinal signs of a "surgical abdomen," needing immediate surgery. Although the nurse's notes reflected a fever earlier, when he examined her, she was afebrile.

On Tuesday, March 1, Dr. Sholes examined Mrs. Cantrell, finding no marked guarding or rebound tenderness. He and Dr. Hill, another partner, then performed the laparoscopic exam and found that her appendix had ruptured and was gangrenous. In addition to the cysts, she had adhesions covering her ovaries.

Dr. Brown, a surgeon, was called in and removed her appendix. Four hours later, Dr. Brown determined that she was "shocky," with low blood pressure and an elevated pulse. He placed her in ICU and determined that she was in septic shock. She was given antibiotics and responded over the next 24 to 48 hours and her blood pressure returned to normal. She continued, however, to run a temperature and Dr. Brown was concerned about an abscess. After additional testing, on March 9, he took her back into surgery and removed approximately a cup of fibrinous material from around her liver. Such material is a reaction to recent infection. Approximately four hours after this operation, she again became shocky and was treated as before, including the use of a respirator.

After the second surgery, her respiratory function deteriorated

and Dr. Murray, a pulmonologist, was called in to treat her for Adult Respiratory Distress Syndrome (ARDS), including chemically paralyzing her for 16 days to assist her breathing. She suffered a number of pneumothoraxes during this period and on March 15, she was operated on and a breathing tube was put in place. Dr. Brown never discovered any source of infection after removing the fibrinous material and it was his opinion that the infection had cleared, her continued elevated temperatures were the result of the ARDS, and that she would recover. Before her discharge, all tubes had been removed from her chest and her lungs had re-expanded.

On March 25, Mrs. Cantrell suffered an unexplained brain insult, causing her to go into a vegetative state, from which she never recovered. She was then transferred to a nursing home where she died in October 1995 from respiratory failure, likely due to recurrent aspiration pneumonia.

The only opinion expressed at trial regarding the cause of the March 25 incident was that of Dr. Murray, the pulmonologist, who stated that, while he could not explain what happened, an air embolus was one possibility. When a ventilator is used, air sometimes gets into the blood stream and blocks flow in the vessels. Such an event is not preventable.

1. Cantrell's first enumeration is that the court erred in granting Dr. Lewellen's motion to bifurcate the liability and damages issues for trial "on the grounds of prejudice where there were no inflammatory photographs nor any evidence of prejudice and the Judge during the trial repeatedly referred to the case as being sad, tragic."

(a) This enumeration, however, also includes five subsections dealing with exclusion of various witnesses' testimony.

"This court has long recognized that OCGA § 5-6-40 requires that an enumeration of errors 'shall set out separately each error relied upon.' . . . Therefore[,] for the purpose of protecting our judgments on appellate review (cit.) this court, in the exercise of our sound discretion, may elect to review any one or more of the several assertions of error contained within a single enumeration and to treat the remaining assertions of error therein as abandoned." *West v. Nodvin*, 196 Ga. App. 825, 830 (4) (c) (397 SE2d 567) (1990). Therefore, we consider only the issue of the court's grant of the motion for bifurcation.

(b) OCGA § 9-11-42 (b) provides that "[t]he court, in furtherance of convenience or to avoid prejudice, may order a separate trial of any claim, . . . or of any separate issue, or of any number of . . . issues."

Here, prior to entry of the pretrial order, Dr. Lewellen filed his motion to bifurcate the liability and damages issues of this case because to do so would be expeditious, economical and avoid prejudice to the doctors and hospital based on Mrs. Cantrell's lengthy

suffering and eventual death and the emotional, as well as financial damages imposed upon her husband and daughters by it. The court agreed and granted the bifurcation.

Trial courts are vested with wide discretion in the management of the business before them and this Court will not interfere absent clear and manifest abuse of discretion. *Whitley v. Gwinnett County*, 221 Ga. App. 18, 19 (2) (470 SE2d 724) (1996); *APAC-Ga. v. Padgett*, 193 Ga. App. 706, 708 (1) (388 SE2d 900) (1989); *Vitner v. Funk*, 182 Ga. App. 39, 40 (1) (354 SE2d 666) (1987).

No such abuse of discretion has been shown here and the cases relied upon by Mr. Cantrell are inapposite. The suggestion that any prejudice to the medical providers could have been alleviated by instructing the jury not to let sympathy for the family affect its deliberations does not show any abuse of discretion in bifurcating the issues instead. Additionally, despite Cantrell's argument that some evidentiary showing of prejudice is required and was not present here, the defendants relied upon Mr. Cantrell's deposition and proffer at trial concerning his caring for Mrs. Cantrell after she went into a vegetative state as well as his graphic description of her physical reactions at the time the brain insult occurred in order to show prejudice. There was no error in bifurcating the liability and damages issues. See *Hanie v. Barnett*, 213 Ga. App. 158, 160 (1) (444 SE2d 336) (1994).

2. After the close of the evidence, the court granted the hospital's motion for directed verdict because there had been no showing of independent negligence by hospital employees and there had been no holding out by the hospital of Dr. Lewellen as anything but an independent contractor, as evidenced by the hospital's sign at the registration area and the consent to treatment form. Mr. Cantrell enumerates the directed verdict as his seventh enumeration, contending there was a question of fact on the issue of ostensible or apparent authority based on *Abdul-Majeed v. Emory Univ. Hosp.*, 213 Ga. App. 421 (445 SE2d 270) (1994).

Unlike *Abdul-Majeed*, where there were some factual issues regarding the hospital's holding out of the doctor and reliance on it, there are no such factual issues here. This case is factually similar to *Holmes v. Univ. Health Svc.*, 205 Ga. App. 602 (423 SE2d 281) (1992) where, as here, conspicuous signage was posted and forms signed by the patient or representative revealed the independent contractor status of the doctor. See also *Charter Peachford &c. v. Kohout*, 233 Ga. App. 452, 461 (f) (504 SE2d 514) (1998); *Sorrells v. Egleston Children's Hosp. &c.*, 222 Ga. App. 229 (474 SE2d 60) (1996) (physical precedent).

There was no error in granting a directed verdict to the hospital on the issue of apparent authority.

3. The second enumeration is that the trial court erred in granting the hospital's motion in limine which sought to exclude evidence of Mrs. Cantrell's self-extubation on March 2 and evidence from Dr. Sladen suggesting that nurses are less attentive during shift changes and that Mrs. Cantrell might have self-extubated on March 25 during a shift change.

The hospital made its motion for directed verdict after the close of plaintiff's case on two bases, one that there was insufficient evidence to go to the jury on apparent authority regarding Dr. Lewellen and that, absent Dr. Lewellen's acts, there was no evidence of negligence by any other hospital employee. In response to this latter ground, plaintiff's counsel stated "[t]hat's right. I am going to proffer evidence but there is nothing else. It's just strictly the agents, apparent agency."

There was no mention of any connection between the proffer of the remaining deposition testimony of Dr. Sladen,[1] tendered over 200 pages later in the trial transcript, and any attempt to show additional negligence on the part of hospital employees. Therefore, the argument presented here for the first time will not be considered. *Cornelius v. Wood*, 223 Ga. App. 339, 341 (1) (477 SE2d 595) (1996).

4. The third and fourth enumerations deal with the testimony of Dr. Sladen, one of Cantrell's expert witnesses, were argued together, and are so considered here.

Dr. Sladen was asked on direct examination "would a rectal exam be unnecessary for a woman if her vaginal exam with a speculum was performed?" He answered, "[t]he literature says that a rectal examination should be performed on every patient who presents with abdominal pain and that's written in Sabiston, which is probably one of the very best textbooks. . . ." The hearsay objection made to this answer was sustained, but the court advised Cantrell, "[i]f you want to revisit it later you may." Thereafter, Dr. Sladen was asked the same question and responded that a rectal examination was "essential."

Pretermitting the nonresponsiveness of the answer given to the question asked and the fact that the question asked was then answered without objection, we find no error.

" 'An expert may give an opinion upon the facts testified to by other witnesses, but not upon their opinions. A witness' opinion must be his own and he cannot act as a mere conduit for the opinions of others.' (Citations and punctuation omitted.) *In the Interest of A. S. M.*, 214 Ga. App. 668, 671 (1) (448 SE2d 703) (1994)." *Jordan v. Ga. Power Co.*, 219 Ga. App. 690, 693 (1) (466 SE2d 601) (1995); *Austin v.*

---

[1] A portion of Dr. Sladen's deposition had been introduced during Cantrell's case.

*Kaufman*, 203 Ga. App. 704, 709 (6) (417 SE2d 660) (1992). While Dr. Sladen could give his own opinion based on his reading of Sabiston, he could not merely recite Sabiston's opinion, as that was hearsay. Id.

Dr. Sladen also attempted to give an opinion based on what he had read in the deposition of Mr. Cantrell. That deposition, however, was not in evidence nor had he yet testified at trial and there was no error in excluding this opinion, since an opinion must be premised on facts in evidence. Id.

5. The fifth enumeration, as did the first, contains inappropriate subparts dealing with multiple errors and we consider only that portion contending that the court erred in "granting the request of the Defendants' attorney[s] that they be excused from objecting to any testimony that would be inadmissible and taking over the objection and admonishing the Plaintiff's attorney in tendering and proffering evidence that would be inadmissible for any legal reason or because the evidence would involve issues of damages." *West*, supra.

The record reference reflecting this "grant" of such a request, however, is the culmination of lengthy pretrial discussions among plaintiff's counsel, defense counsel and the court regarding the bifurcation of liability and damages, discussed in Division 1. The court instructed plaintiff's counsel that the fact of damage, i.e., death, could be proven during the liability phase of the trial, as it was through the testimony of Dr. Whitehead, the physician attending Mrs. Cantrell at the time of her death, but that "the extent of her pain and suffering, the extent of her losses must be reserved for the second phase of this trial." Further, the court advised that the "issues to be addressed in the liability phase of this case will be two, and the issues are was there malpractice and did the malpractice cause Ms. Cantrell's death." In response to the continued objections of Cantrell regarding the bifurcation and problems counsel anticipated in presenting evidence as a result of it, the court directed that "you need to limit the evidence to the two issues of was there malpractice and did the malpractice cause death."

At the conclusion of plaintiff's case, represented in the record by over 300 pages of transcript after the above-quoted discussion, plaintiff's counsel tendered "additional testimony" of Mr. Cantrell, Dr. McDaniel, a physical rehabilitation specialist, and Dr. Eyzaguirre, an internist/cardiologist, by presenting to the court the entirety of their pretrial depositions. Defense counsel noted that portions of those depositions might be admissible if specified and the court concurred. In response, counsel for Cantrell stated that "[y]ou have ordered me to cull out the parts that would be admissible in phase one. We're going back to this morning. And I say that's not my obligation. I am offering evidence [the depositions], it's up to the defendants to object. You put an obligation on me that I suggest the law doesn't put on

me." In response, the court made the statement referenced in Cantrell's argument regarding this enumeration, "[t]he law puts an obligation on you not to tender clearly inadmissible evidence and that's the responsibility I put on you and it's your obligation to follow that direction and it's fairly clear. So what do you want to do [regarding the depositions]?"

It is clear that the court was not taking over the defense's obligation to object, but was merely directing that his previously issued order bifurcating the trial be followed and that evidence relating only to damages not be tendered in contravention of that order.

Additionally, as the court noted for the record, he had not read the depositions and was not able to make a judgment on their admissibility based on the mass tender of the depositions. Despite Cantrell's protest to the contrary, it is the obligation of a party to make a specific tender of evidence which they contend is improperly excluded and the failure to do so precludes our review of this contention. *Barron v. Barron*, 185 Ga. 346 (2) (194 SE 905) (1938); *State Farm &c. Ins. Co. v. Hudson*, 215 Ga. App. 218, 219 (2) (450 SE2d 286) (1994); *Ellis v. Cameron & Barkley Co.*, 171 Ga. App. 211, 212 (2) (319 SE2d 38) (1984).

Although this situation did not specifically deal with a motion in limine, those cases offer guidance. " ' "The purpose in filing a motion in limine to suppress evidence [or motion to bifurcate liability and damages] or to instruct opposing counsel not to offer it is to prevent the asking of prejudicial questions and the making of prejudicial statements in the presence of the jury with respect to matters which have no proper bearing on the issues in the case. . . . It is the prejudicial effect of the questions asked or statements made in connection with the offer of the evidence, not the prejudicial effect of the evidence itself, which the motion in limine [or motion to bifurcate] is intended to reach." *Bridges v. City of Richardson*, 163 Tex. 292 (354 SW2d 366, 367) (1962).' [*Harley-Davidson Motor Co. v. Daniel*, 244 Ga. 284 (1) (260 SE2d 20) (1979)]." *Reno v. Reno*, 249 Ga. 855 (295 SE2d 94) (1982).

6. We consider the sixth enumeration, but not its subpart. *West*, supra. That enumeration is that the court erred in not admitting plaintiff's Exhibits 3, 4, and 5, photographs of Mrs. Cantrell with her children before her illness, and Exhibit 6, a videotape of her in her vegetative state being ministered to by her family and medical staff.

The videotape was arguably relevant only as to damages and there was no error in excluding it from the liability phase. Even assuming, without deciding, that the photographs were admissible and improperly excluded, Cantrell can show no harm from their exclusion if their purpose, as argued, was to show that, prior to these events, she was "alive and in good health." Other evidence of this was

admitted without objection, including the testimony of her 16-year-old daughter regarding her mother's vibrancy and involvement in her church, community, and the lives of her children. *Hardy v. Tanner Med. Ctr.*, 231 Ga. App. 254, 255 (1) (499 SE2d 121) (1998); *Wood v. Browning-Ferris Indus. &c.*, 206 Ga. App. 707 (3) (426 SE2d 186) (1992).

7. The final two enumerations deal with the court's charge on agency, relating only to Drs. Sholes and Connor and their acts as imposing liability on the professional corporation, and the use of a special verdict form which allowed for corporate liability based only on the doctors' negligence and not on that of the ultrasound technician and midwife. There was no contention of negligence by either of these latter two individuals in the pretrial order entered in this case, however, nor was any expert testimony provided regarding any such negligence. There was no error.

*Judgment affirmed. Johnson, P. J., and Smith, J., concur.*

DECIDED NOVEMBER 2, 1998 —
RECONSIDERATION DENIED NOVEMBER 20, 1998

*Clark & Clark, Fred S. Clark*, for appellant.
*Forrester & Brim, Weymon H. Forrester, Whelchel & Dunlap, Thomas M. Cole*, for appellees.